UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

-v-

Case No. 23-20245

OMAR SHORTER, JR.,

Defendant.

_____________________________________/

JURY TRIAL

BEFORE THE HONORABLE JUDITH E. LEVY
UNITED STATES DISTRICT JUDGE

APRIL 8, 2024

APPEARANCES:

For the Government:

Jasmine A. Moore
DOJ-USAO
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Darrin Crawford
DOJ-USAO
211 W. Fort Street, Suite 2001
Detroit, MI 48226

For the Defendant:

James R. Gerometta
Law Office of James Gerometta
27 E. Flint Street, Suite 2
Lake Orion, MI 48362

Casey N. Swanson
Federal Community Defender
613 Abbott Street, 5th Floor
Detroit, MI 48226

To Obtain a Certified Transcript Contact:
Jeseca C. Eddington, RDR, RMR, CRR, FCRR
Federal Official Court Reporter
United States District Court
200 East Liberty Street - Ann Arbor, Michigan 48104

**I N D E X**

WITNESSES PAGE

STEFAN BAHRI
Direct examination by Mr. Moore.........25
Cross-examination by Mr. Gerometta......53
Redirect examination by Ms. Moore.......66
Recross-examination by Mr. Gerometta....69
Redirect examination by Ms. Moore.......82
Recross-examination by Mr. Gerometta....84
Redirect examination by Ms. Moore.......84
Recross-examination by Mr. Gerometta....85

STEVEN ALLICK
Direct examination by Ms. Moore.........86

EXHIBITS MARKED ADMITTED

Government's Exhibit 4C.......99.............100
Government's Exhibit 7C.......100............100
Government's Exhibit 6C.......99.............100
Government's Exhibit 8C.......99.............100
Government's Exhibit 10C......99.............100
Government's Exhibit 32C......99.............100
Government's Exhibit 34C......99.............100
Government's Exhibit 37B......116............116
Government's Exhibit 40.......31.............32
Government's Exhibit 41.......44.............45
Government's Exhibit 42A......91.............92
Government's Exhibit 42B......91.............92
Government's Exhibit 42C......91.............92
Government's Exhibit 42D......91.............92
Government's Exhibit 42E......91.............92
Government's Exhibit 42F......91.............92
Government's Exhibit 44A......111............111
Government's Exhibit 44B......111............111

Defense Exhibit A.............77.............78

MISCELLANY

Proceedings..................................3
Opening Statement by Government..............12
Opening Statement by Defense.................19
Certificate..................................128

**P R O C E E D I N G S**

THE CASE MANAGER: The Court calls case number 23-20245, United States of America vs Omar Shorter, Jr.

Counsel, please put your appearances on the record.

MR. GEROMETTA: Mr. Shorter is not here yet, Your Honor.

THE COURT: Oh.

MR. GEROMETTA: Let me call him real quick.

THE COURT: Okay. Let's not do anything without Mr. Shorter. I noticed that there was almost no traffic right around downtown. There is an eclipse watching party right across the street by the library that you're welcome to attend on behalf of the -- I'm an ambassador for the City of Ann Arbor now.

MS. MOORE: Thank you. It's set for 1:33?

THE COURT: To start. But I think we don't get our maximum coverage of the sun until 3 something.

MS. MOORE: Okay.

MR. GEROMETTA: I apologize, Your Honor. He thought he was supposed to be here at 9:00. He's outside. He's coming.

THE COURT: We'll wait. Okay.

(Pause In Proceedings)

THE COURT: Welcome, Mr. Shorter. I understand you didn't know we were starting before 9:00. Generally we'll

start at 8:30 with just the lawyers and their clients so that the jury can gather and we don't use their time for our legal issues.

Ms. Moore, we were going -- you were about to put on the record something regarding the PowerPoint?

MS. MOORE: Yes, Your Honor. The government has concerns. We did communicate about our respective opening PowerPoints. The defense did represent that there is one slide in particular that contains a photo that is not intended to be introduced into evidence. So the government just has concerns about showing this to the jury as it may be somewhat misleading.

The photo purports to be of a sale at a gun show. And we just -- we don't want to confuse the jury with that material that may not be relevant to the facts of this case.

THE COURT: Mr. Gerometta -- or Ms. Swanson, is the photo like a stock internet photo and you're just trying to kind of keep us engaged by seeing photos of guns?

MS. SWANSON: Sort of. I mean so the slide that it's on -- and I have this printed out if the Court wants to see it.

THE COURT: I'd like to see it. Thank you.

MS. SWANSON: I can pull it up, but it looks like the government's connected.

So the point that I'm trying to make when I have this

picture up is that it's not illegal just to sell guns without a license. It happens all the time. There's gun shows all the time. All sorts of people can sell guns without a license.

In this case, there are no allegations about how most of these guns were sold. And my point is that just because he's unlicensed doesn't mean he can't sell guns.

THE COURT: Ms. Moore?

MS. MOORE: Judge, the charge of engaging in a business -- I'm sorry, engaging in the business of selling firearms without license, I think that the jurors have to assess looking at a totality of circumstances whether there are indicators that Mr. Shorter was actually engaging in the business.

I think that presenting to them a picture of a gun show sale confuses the issue as to whether he's engaging in the business. We concede that you can sell guns at a gun show, but there's nothing to show that that is relevant to the facts of this case.

THE COURT: Okay. So it's this image that I see on the first page. And what about the text that says gun owners can legally sell as many guns as they want?

There's a caveat to that. They can't be a -- replace themselves as a licensed firearms dealer without a license.

MS. SWANSON: I can add that language if the Court

wants.

THE COURT: Well, I agree that using an image that's not admissible as an exhibit in this case could be misleading. I mean, the idea of an opening statement as you're going to preview for the jury the evidence that they'll see and the story of the narrative of your case.

And it seems that the narrative is that a lot of people sell guns. And guns are here. Guns are there. You can buy them. You can sell them. You can do all kinds of things with guns and it's not illegal. So who is not a dealer, a person who sells a personal collection you have. But I think you should limit yourself to the evidence.

But is your narrative that he sold at -- he sold these guns at a gun fair?

MS. SWANSON: We don't have any information about where any of the guns were sold.

THE COURT: Okay. So if you don't, I don't think you should have that image.

MS. SWANSON: Okay.

THE COURT: I just think it's confusing to present the jury with an image that they're not going to -- that's not admissible.

Now, are -- but that probably goes for all of the -- like the person handwriting, I don't know that that's a problem. And then the rest, engaged in the business. There

you've got somebody engaging in the business. Is that an exhibit from --

MS. SWANSON: No.

THE COURT: Okay. Do you have any objection?

MS. MOORE: I don't have an objection to that photo.

THE COURT: Okay. All right. So we'll just have the first photo removed. Because I think it could be very confusing. Oh, my God.

MS. MOORE: Judge, if I may?

THE COURT: Yes.

MS. MOORE: There are different ways you can sell firearms.

THE COURT: Right.

MS. MOORE: I think that in this case, there are going to be multiple ways you can sell guns online. Like there's a marketplace. You can -- there's multiple places that you can sell guns. And I do think that that will come out through the testimony. I just think that the photo itself is misleading and kind of confuses -- it may confuse the jury.

THE COURT: So it will come out that a gun fair -- you can have a carnival or something and put up a exhibit of this looks like 30 guns. You can do that.

And will our ATF agent testify that that is one way to legally sell guns.

MS. MOORE: Judge, if I may just ask my agents really

quick.

THE COURT: If there's testimony about this way of selling guns, then I don't have a problem with the image.

MS. MOORE: Judge, based off the evidence of Mr. Shorter's statement, there's nothing to indicate that he would have been selling guns at a gun show. He said that I sold guns to people that he felt comfortable selling guns to. Friends of friends, friends of family.

So I don't think that in this circumstance it's appropriate because it's not relevant to the facts of the case.

THE COURT: Yeah. The more I think about it, it does not seem that this -- unless there's -- if you're going to present testimony or through cross-examination through other witnesses that the guns at issue in our case were sold at a carnival or a fair, festival, a gun. A gun celebration type place or something like that, then this is fine.

But if you don't have any testimony, if you're -- or any defense, any narrative that would put these the guns at such an event, then I don't think it's appropriate. So thank you.

MS. SWANSON: Okay.

THE COURT: Okay. Well, we have a few minutes. We have 3 minutes.

Anything else?

MS. MOORE: Nothing from the government.

THE COURT: Okay. In terms of the jury instruction, can you email us the competing instructions or whatever document we should be looking at in cases.

MS. MOORE: Yes, Your Honor.

MR. GEROMETTA: Your Honor, this was -- I don't have anything because this was an issue. I thought we had a set of instructions and this was raised this morning. So I don't have anything to email the Court, so.

THE COURT: Okay. Do you want to email something to me later?

MR. GEROMETTA: I would like to at least look at it and see if I want to email you something.

THE COURT: Okay. Okay. Good.

MS. MOORE: Judge?

THE COURT: Yes.

MS. MOORE: If I may, we do have some of the guns that are going to be admitted as exhibits.

Is it okay to display two of the guns on the table?

THE COURT: Let's wait until -- were you planning to point to them during your opening?

MS. MOORE: Yes.

THE COURT: I see. Ordinarily -- let's -- we've had -- in the past, we've had a little carpet replacement here. So a table we had where exhibits could be placed is not

there. I just don't want them just sitting on your counsel table. I'd like them in an official place.

MS. MOORE: Your Honor, may I approach with the exhibit binder for the witness stand?

THE COURT: Oh, I was going to say I think I have it. Sure.

Just an update for counsel -- Ms. Swanson, we're waiting for one juror, number 1, Mary Charara.

MR. CRAWFORD: Your Honor, I plan to try to email you that. My laptop is upstairs.

THE COURT: Okay. As long as at the lunch -- or after court today. Because I won't be reading it during the trial.

Our last juror is parking.

MS. MOORE: Is it okay to place the exhibits on this table?

THE COURT: Yeah. Thank you for asking.

MR. GEROMETTA: Your Honor, could I step to the back of the courtroom with Mr. Shorter and Ms. Swanson for a second?

THE COURT: Sure. We're just lining the jurors up and you'll know when they come in.

THE CASE MANAGER: All rise for the jury.

(Jury In)

THE COURT: Well, please be seated. Welcome back to

the jury. Thank you, very much, for your jury service. And as we talked about on Thursday, we'll begin the remainder of our trial today. It begins with opening statements. And the government will go first, followed by the defense. And they will give you a preview of what they think the evidence will show in this case.

And I just remind you that the statements of lawyers is not evidence itself, but it's intended as a guide so that you know what to expect in the case. So I just ask that you listen carefully. If you can't see something or can't hear something, wave and let us know and we will try to fix it.

So we will start with the government's opening statement.

Is that you, Ms. Moore?

MS. MOORE: Yes, Your Honor. Judge, if I may, can we put our names or appearances on the record?

THE COURT: We did that -- we did that before the jury came in, so. No. We didn't?

MS. MOORE: I'm not sure.

THE COURT: Maybe we didn't. Let's do it. I think we were waiting. That's right. Okay. Thank you for that reminder. Okay.

So for the government, who is here today?

MS. MOORE: Thank you. Jasmine Ayana [phonetic] Moore on behalf of the United States. And I have Danielle

Fawaz who's sitting to my right, as well as Darrin Crawford with the United States.

THE COURT: And Mr. Gerometta?

MR. GEROMETTA: Thank you, Your Honor.

James Gerometta on behalf of Mr. Shorter who's present to my left. Also at counsel table is Casey Swanson.

THE COURT: Fantastic. Thank you. Okay. Ms. Moore.

And for members of the jury, Ms. Moore asked me while we were getting ready whether it would be okay to put some of the upcoming exhibits on our exhibit table, and I granted that permission. So she's doing that now.

MS. MOORE: Thank you.

THE COURT: And I can assure you that the weapons have been disabled from use.

MS. MOORE: Thank you. May I begin?

THE COURT: Yes, please.

OPENING STATEMENT

MS. MOORE: Ladies and gentlemen of the jury, we're here today because the defendant bought firearms on behalf of others and turned that into a business.

During trial, you're going to hear about two crimes that the defendant is charged with. These are gun crimes. First, the defendant is charged with two counts of making a false statement during the purchase of a firearm. Second, the defendant is charged with one count of engaging in the

business of selling firearms without a license.

Starting with the first two counts, making a false statement during the purchase of a firearm. It is a crime to buy guns on behalf of others. Some call it straw purchasing. Some call it lying and buying.

During trial, you're going to learn about the basics of buying a gun from a gun store. You pick out the gun and then you fill out this form called a Firearms Transaction Record. You fill in your information and you attest that you are buying that firearm for yourself and you attest that you're answering those questions truthfully.

During trial, you will see that the defendant went through this same process twice via the surveillance from a gun store. And you'll learn that when he purchased guns each time at the gun store on December 5 and 9 of 2022 that he lied. He lied because he stated that he was purchasing the firearms for himself when he knew, in fact, that he was purchasing the firearms for others.

Starting with December 5 of 2022, on the left, we have the form that I just mentioned that the defendant filled out on December 5 of 2022. And on the right, we have the defendant completing that form.

You'll learn that the top of this form is filled out by the gun store. It lists the firearm or firearms that the person is attempting to purchase. It's then followed by a

section starting at Question 9 that the person purchasing the firearm is responsible for completing.

And when you get to Section 21, it asks you a question that is very, very important. Are you the buyer of this firearm? It's then followed by a warning that if you are not the actual buyer of the firearm, if you're acquiring that firearm on behalf of another person, if you're not the actual buyer, that gun store cannot transfer that firearm to you.

You will see that the defendant checks the box yes, that he is the purchaser of this firearm on December 5 of 2022.

You will also see on the second page of this form that the defendant certifies that his answers were true. It also states that he understands that answering yes to Question 21A if he is not the buyer is a crime. And he signs his name as well on that form on December 5 of 2022.

Defendant's background check is then completed. He then paid for the gun and he left that store on December 5 of 2022 with a GC3 [sic] Taurus pistol.

You will learn that four days later, the defendant entered that same gun store and he bought that same exact gun, a Taurus GC3 pistol. However, this time he was not alone. The other men that he was with are the Berryman brothers.

As you can see pictured, the defendant is in the front and he's followed by the brothers who are entering the

door. After browsing the store for a while, after all three of them entered, they then all three exited that same store. And this is on December 9. That's four days after the December 5 purchase.

So they all exit the store together and go back out to the car. But the defendant returns in by himself and he leaves the Berryman brothers at the car.

So turning our attention again to this December 9 date. The defendant returned alone and he completed that same form that he talked about on December 5. As you can see, the form that he completed with that Taurus GC3 pistol. And you also have the defendant, again, filling out that form stating that he is the purchaser of that firearm.

He again checks the box yes, he is the actual buyer of the firearm. He again certifies on the second page that his answers are truthful and he signs his name. His background check is completed and it comes back clear. He's able to purchase that firearm and he leaves again with that GC3 pistol.

You're going to hear that the ATF, the federal agents from the ATF spoke to the defendant after these two purchases. And you're going to learn that the defendant admitted that he purchased the firearms on December 5 and December 9 of 2022 on behalf of the Berryman brothers.

He identifies the brothers with him on -- at the

store on December 9 of 2022. He also admits that they paid him via Cash App for the guns. You'll see, again, evidence from that surveillance at the gun store that one of the brothers' phones lights up for Cash App. And we can also see the records from the defendant's phone with a -- showing that one of the brothers transfers him $370. This happens in realtime as the brothers are browsing the store with the defendant on December 9 of 2022.

Now we're going to turn to Count 3, engaging in the business without a license. This charge sort of speaks for itself. You have to have a license to sell guns or to engage in the business of selling firearms.

We have a stipulation here that the defendant agrees that he does not have a license to engage in the business of selling firearms. During trial, you will learn that the defendant purchased a lot of firearms during a short period of time.

Specifically you're going to hear that in 2020, the defendant purchased 11 guns. Two guns in July and nine more guns in October. In one instance, he purchased two of the same make and model Anderson Manufacturing guns. Two days later on October 26 of 2020, he purchased five firearms during one trip to the gun store. Three Glock handguns as well as two Omni Hybrid Maxx pistols. The total cost of this one trip will be more than $4,000.

In 2021, you'll learn that the defendant purchased a additional 25 guns. In a span of less than six weeks, he purchased 19 guns. Including on one date he purchased the same make and model firearm four times in one trip to the gun store. Four guns, the exact same make and model. In total again, 25 guns in a short period of time.

Turning to 2022, we've already talked about these two Taurus GC3 pistols. Or G -- yes, the G3c pistols that the defendant purchased for the Berryman brothers on December 5 and December 9 of 2022. Keep in mind, the same make and model.

You'll learn that of these 39 guns that the defendant purchased, that 9 of these the guns were recovered by law enforcement.

What does recovered by law enforcement mean, ladies and gentlemen? It means that the guns are recovered by law enforcement during criminal investigations by law enforcement.

And you'll actually hear from the officers that seized the weapons and they'll tell you that the defendant is not present during that seizure or the gun is seized from a place that he is not there. I'm sorry. It's either seized from a place that he's not or it's seize from a person that is not Mr. Shorter.

You'll also learn that at some point the federal agents from the ATF went and spoke to the defendant and he

admitted that he had bought a lot of guns and that he had sold most of them.

As you can see, we have the two guns that were left remaining of the 39 guns that the defendant purchased. Only these two guns were found at his home. So of 39 guns, in the end, this is all that we have, ladies and gentlemen.

The defendant is charged in three counts. Two counts of making a false statement during the purchase of a firearm, one count of engaging in the business of selling firearms without a license. We ask that you hold the defendant accountable and we ask that you return a guilty verdict on all three counts. Thank you.

THE COURT: Thank you, Ms. Moore.

And now Ms. Swanson will give an opening statement for Mr. Shorter, the defendant.

MS. SWANSON: Thank you, Judge. I just need a minute to figure out the computer and the cord.

THE COURT: Sure.

For members of the jury, when I was doing this as the lawyer, we didn't have all the fancy broadcasting up here. So we had these big exhibit boards that we would have printed up. And someone like an assistant would help move those boards and they will collapse and fall. And this is much better once we get it working.

Do you need our help to get it --

MS. SWANSON: I think we're close to figuring it out.

THE COURT: We've got it. We've got it. Okay. Good.

OPENING STATEMENT

MS. SWANSON: Good morning.

THE JURY: Good morning.

MS. SWANSON: There is no denying that Mr. Shorter loves guns. You will hear that he bought 39 of them. And you will hear that some of them are similar. That's okay. You'll hear that Mr. Shorter sold almost all of his guns without having a Federal Firearms License or an FFL. That's okay, too.

This country is full of gun people. And when people love guns, sometimes they buy and sell a lot of them. The evidence will show you that people are allowed to do that even without a license.

You'll hear from one of the government's witnesses, a person from the ATF, which is the Bureau of Alcohol, Tobacco and Firearms. We expect that he will talk to you about the experiences he's had as an ATF agent. We expect that he'll tell you that he believes when people buy multiple guns, sometimes it's guns that they are acquiring on behalf of other people.

We also believe that he will tell you about terms that he calls "collector guns" and "crime guns". But as you

listen to the evidence, it will show you that these terms are distinctions that are made up by ATF agents who have dedicated their careers to seizing guns. And I think you need to remember that.

When you listen to this person testify from the ATF, understand that he is talking to you from that perspective. One of an ATF agent. And the ATF, if you haven't figured out already, is the agency that polices guns.

We expect that this ATF agent will also tell you that he believes that when people are engaged in unlicensed gun trafficking, that they buy cheap guns. But when you listen to the evidence, you'll see that a lot of the guns that Mr. Shorter bought weren't particularly cheap. And in fact, some of them were really expensive guns.

You'll see that Mr. Shorter got his CPL or his concealed pistol license in 2020. He doesn't need that to buy guns, but that's the time that he got one. You'll see that he bought a lot of guns in 2020 and 2021 as you heard.

And then you'll see that in 2022 and 2023, he actually didn't buy a lot of guns. In 2022 and in 2023, each year he bought two guns. And you'll hear that the two he bought in 2023 were actually found in his home.

Throughout, you'll hear that he bought a lot of Glock guns, for example. But understand that Glock is a huge gun manufacturer. And you'll hear evidence that Glock makes a lot

of different models of guns, a lot of different calibers. And we'll talk about tall of that as we get the witnesses up here to testify.

Now in this country, it's important to remember that people are generally allowed to have guns. Felons can't have guns. But that's not what this case is about. Mr. Shorter is not a felon. He is allowed to have as many guns as he wants. Everyone who is allowed to have guns is allowed to have as many guns as they want. They are allowed to sell those guns. They're allowed to do a lot of different things with those guns.

You'll hear, when these witnesses testify, that people are allowed to buy guns and sell them. They can collect them. They can trade them or give them away. They can Cash App each other for them. They can store them outside of their homes. They can buy duplicates. They can buy accessories and alter those guns.

There is no limit to how many guns someone can buy, sell, or trade. And there is no time limit to how quickly someone can sell their gun after they buy it.

There are two main issues that I want you to pay attention to in this case. The first that we need to focus on is that the government believes that Mr. Shorter was engaging in the business of dealing firearms without a license. But the evidence will show you that he was not.

You will hear that just because someone is selling guns and doesn't have a license alone is not enough to make it illegal for them to sell those guns. The government wants you to think that this is a straightforward charge and it's just someone buys a lot of guns and sells a lot of guns.

And you're going to hear that Mr. Shorter bought a lot of guns. You're going to hear that Mr. Shorter sold a lot of guns. And you already heard he didn't have a license. That's all true. And that's all okay. Like I said, that, by itself, is not enough to mean that he was engaged in the business of dealing firearms.

The judge will instruct you on the law as it relates to this charge. Pay very close attention to the definitions that she explains when she reads that instruction.

Some things don't count as being engaged in the business of dealing firearms. For example, the evidence will show that Mr. Shorter had and sold a personal collection. The evidence will show that Mr. Shorter did not make a profit. Those things matter.

Now, I want to talk about the other issue, the allegation that Mr. Shorter knowingly made false statements when he filled out ATF forms. When you hear witnesses and see evidence in this case, you will hear a lot about a form called an ATF Form 4473. That's the firearms transactions record. We heard a little about that already.

There are two relevant copies of that form in this case. One is one that Mr. Shorter filled out on December 5 of 2022. And the other Mr. Shorter filled out on December 9 of 2022.

An ATF form is a long technical document. It's six pages. It's full of fine print. It asks a lot of questions. And it's important to remember that the government must prove that Mr. Shorter knowingly made a false statement on that form. And the evidence will not show that.

Can you think of a time that you looked at a long legal form and either scrolled to the bottom or checked the boxes and signed off or clicked "accept all" without having carefully read each portion? I'll raise my hand. I'm a lawyer and even I do that.

And the evidence will show that this is what happened here. It's important to pay attention to what evidence the government has about what Mr. Shorter's state of mind was at the time he filled out these forms, what he intended, and what he knew.

Mr. Shorter has filled out this form dozens of times before. The evidence will show that he was going through the motions and checking the boxes that he always checks without stopping to read each one carefully. He made a mistake. It was an honest mistake. It was stupid. But it was a mistake nonetheless.

The evidence will show that Mr. Shorter did not knowingly make a false statement. The evidence will show that Mr. Shorter did not intentionally deceive the firearms dealer.

Throughout this case, you're going to hear about a lot of guns. You're going to hear about a lot of forms. I'd ask that you stay focused to the issues relevant to what we've just talked about. And please listen very carefully to what evidence the government has about Mr. Shorter's state of mind when he was doing this. And at the end, we will ask you to return a guilty -- a not guilty verdict. Thank you.

THE COURT: Okay. Thank you, Ms. Swanson.

So now what we do is we start with the evidence in the case. And remember, that's what comes in through somebody testifying under oath in the witness box, exhibits that are admitted as evidence. And really nothing else.

So Ms. Moore, does the government have a witness you wish to call at this time?

MS. MOORE: Yes, Your Honor. The government calls Stefan Bahri.

THE COURT: Okay.

MS. MOORE: Your Honor, may I move the lectern?

THE COURT: Sure. So that you're facing the witness. Absolutely.

MS. MOORE: Yes. Thank you.

THE COURT: It's on wheels.

MS. MOORE: Okay.

THE COURT: Okay. Will you stand and raise your right hand.

Do you solemnly swear or affirm to tell the truth, the whole truth, and nothing but the truth?

Thereupon,

**S T E F A N   B A H R I ,**

having been called as a witness and having been first duly sworn testified as follows:

THE COURT: Thank you. Then have a seat in our witness box. Okay. Go ahead.

MS. MOORE: Thank you, Judge.

DIRECT EXAMINATION

BY MS. MOORE:

Q. Good morning, Mr. Bahri.
A. Good morning.
Q. Can you please introduce yourself to the jury.
A. My name is Stefan Bahri, last name B-a-h-r-i.
Q. And Mr. Bahri, where do you work?
A. I work for Action Impact in Eastpointe.
Q. What is Action Impact?
A. It is a retail gun store, a shooting range, and we also teach CPL classes.
Q. Okay. When you say CPL classes, what is a CPL class?
A. It's a class to obtain a Concealed Pistol License. It is

a license that you need to conceal carry a firearm in Michigan.
Q. Okay. And gun range, can you generally explain what that is?
A. It's an open shooting range for people to come in and either test out their firearms or maybe test out potentially one they might purchase.
Q. Okay. So it has three -- your business has three components?
A. Yes, ma'am.
Q. Okay. And how long have you been at Action Impact?
A. I've been working at that location for about eight years now. I've been the manager for the last five years.
Q. And what are your -- what were you before you were a manager?
A. I was a sales representative.
Q. Okay. What were your responsibilities as a sales representative?
A. To help customers coming in to either purchase a firearm or get situated with a class or potentially to go on the shooting range.
Q. Okay. And what are your responsibilities now as a manager?
A. So as a store manager, my duties are placing the orders of products, accessories for the location. I do all the hiring and the firing. And help the customers if needed as well.

Q. You said you help the customers if needed?
A. Um-hum.
Q. Okay. When -- are you responsible for actually going through the sales process with a customer?
A. Yes, ma'am.
Q. Okay. Do you ever, in your role as manager, get involved helping your sales associates?
A. Yes.
Q. Okay. And when would that happen?
A. So I check all of the paperwork before the customer leaves the store to make sure that the customer did the paperwork correctly and also the staff.
Q. Okay. And what do you check for?
A. To make sure all the information is correct on the paperwork. Make sure the information is correct on the sales record that the customer has to turn in to the police department.
Q. Okay. We'll get into what a sales record is a little bit later. But you said you have to check all of the information?
A. Yes, ma'am.
Q. Okay. And what if there is an error, what happens?
A. We would normally correct that error that day.
Q. Okay. And how would you correct that error?
A. If it's by having the customer refill out the form or have my employee have to, you know, refill out his section of the

form as well.
Q. Okay. As manager, do you ever have to sometimes ask people to leave the store?
A. Yes, ma'am.
Q. In what circumstances?
A. If people are intoxicated, if they smell like alcohol or marijuana, or if we are under the impression that the sale -- the person buying the firearm may be acting a little weird or suspicious or what we call a straw sell or somebody's buying a firearm for somebody else.
Q. Okay. And why is that a problem?
A. Why is that a problem?
Q. A straw sale.
A. Because the person is buying the firearm for somebody else, probably somebody who cannot -- who's not able to purchase the firearm.
Q. Okay. Action Impact is an FFL; is that correct?
A. Yes, ma'am.
Q. Okay. And can you please educate the jury on what an FFL is?
A. An FFL is a Federal Firearms License, which is the license that we need as a business to be able to sell firearms to the public.
Q. Are you considered to be a federal agency or are you licensed by a federal agency?

A. We're licensed by a federal agency, by the FBI.
Q. You said by the FBI?
A. Um-hum.
Q. Okay.
THE COURT: Are you familiar with the ATF?
THE WITNESS: I'm sorry?
THE COURT: Are you familiar with the ATF?
THE WITNESS: Yes, ma'am.
BY MS. MOORE:
Q. Okay. Mr. Bahri, I'm sorry. I just want to back up.
So you said that you are licensed by the FBI?
A. The background check system that we use is the FBI background check system, but the licensing is through the Federal Government.
Q. Okay. And you stated that Action Impact sells firearms?
A. Yes, ma'am.
Q. Do they also sell ammunition?
A. Correct.
Q. Anything else that Action Impact sells?
A. Accessories, holsters, a taser.
Q. Okay. Can you explain for the jury generally how this store is laid out at your location in Eastpointe?
A. When you walk in through the double doors, there's a center island where all of the firearms are located. There's ammunition behind that counter. When you walk in, to the right

would be like holster sections. And then to the far left would be the shooting range.
Q. Okay. And is there a designated place at your store where people complete forms?
A. Yes. There's a table in the back.
Q. Okay. And is that table -- where would that table be located?
A. If you were to walk in through the front doors, it would be to the far right.
Q. Okay. You said you started at Action Impact as a sales associate. In that role, how many guns, say in a week, would you sell to customers?
A. On average, I would say anywhere from maybe 5 to 10 a day.
Q. Can you walk me through the process of selling a firearm to a person step by step?
A. So the hard part is figuring out which firearm that the customer wants to purchase. After we've narrowed that down, that's when we would start the paperwork. So we would first copy the customer's state ID or driver's license.
If they have the CPL card, we would copy that as well. And then we would instruct them on filling out the form. Generally it would start at a certain number, we'll say 9, and then ends at 23. Then they would sign and date after they've answered all of the questions.
Q. Okay. And generally, what happens after they sign and

date?
A. We would review the form, make sure that they've filled everything out correctly. And then we would enter their stuff into the NICS database, which is the federal background check system.
Q. Okay. And so you said something about a form that you give them. What is that form called?
A. That is ATF Form 4473.
MS. MOORE: Let the record reflect that I have showed opposing counsel what's been previously marked as Government's Proposed Exhibit 40.
Your Honor, can I have the witness turn to that exhibit in the exhibit book?
THE COURT: Sure.
BY MS. MOORE:
Q. Mr. Bahri, if you can open up the exhibit book and turn to Exhibit 40.
A. Um-hum.
Q. Do you recognize it?
A. Yes, ma'am.
Q. What is it?
A. This is a form that the customer would fill out prior to us running the background check.
Q. Okay. And is that form dated?
A. Yes. It's dated on the inside of the second page.

Q. Okay. Do you know -- so I'm -- is this a form that would have been used back in 2022?
A. Not this exact setup. But I believe, yes, this is the exact form.
Q. Okay. How is it different?
A. The only difference mainly is that the information here where the firearm goes used to be on the inside of the page. And then now it's here at the front of the page.
Q. Okay. Is there something at the bottom of the page that indicates when that form was last revised?
A. Yes. This one was revised in May of 2020.
Q. Okay. So does it -- does this form fairly and accurately depict the 4473 form that would have been used in December of 2022?
A. Yes, ma'am.
Ms. Moore: I'm going to move -- Your Honor, move to admit the exhibit.
THE COURT: Okay. Any objection?
MR. GEROMETTA: No objection.
THE COURT: Okay. Then it's received.
(Government's Exhibit No. 40 Admitted Into Evidence)
THE COURT: And so just because this is our first exhibit, this is exactly how it goes. One lawyer for the other side or the other offers a exhibit. A witness will identify it. We'll find out whether there's an objection.

And then when I say that it's received, then we know that it's an exhibit for your consideration as the case goes on. So we have received it.

MS. MOORE: Thank you, Judge. May I publish?

THE COURT: Yes. And publishing is our word for showing it to you.

BY MS. MOORE:

Q. All right. Mr. Bahri, I'm showing you Exhibit 40.

Can you see it on the screen in front of you?

A. Yes, ma'am.

Q. Can you please tell me a little bit about the top of the form? So Section A.

A. Sure. So like I first mentioned when we -- when the customer decides which firearm that they want to purchase, we have to write it on the top of the form.

So Section 1 would be the manufacture, and then Section 2 is the model, Section 3 is the serial number, and then Section 4 is the type of firearm that it is. Meaning like it's a rifle, pistol, or shotgun. And then Number 5 would be the caliber or the gauge that that firearm would shoot.

Q. Okay. And Mr. Bahri, looking at this form, I see -- on the left I see a 1, a 2, and a 3.

So can a person purchase more than one firearm at a time?

A. A person can purchase more than one firearm. So the form

allows us to write three firearms on this section. If the customer were to purchase more than three, then there's a second copy that we would print out that would show maybe from 4 down to maybe 15 or 20 spots.

Q. Okay. So let's look at Section B of this form.

What -- who fills out this part of the form?

A. That is where the customer would start. So the customer would start Section B at Number 9. They would make their way down the page to the second page and then they would sign at 22 and date at 23.

Q. Okay. So is this just Section B -- so from 9 to 19, is it just identifiers about the person purchasing the weapon?

A. Correct. Yes, ma'am.

Q. Okay. Let's now look at 20 down. Okay.

Can you please explain to the jury what this section of the form is about?

A. This part of the form here is a questionnaire part that the customer has to fill out. It asks questions such as are you under indictment where you could be potentially sentenced to over a year? Are you a fugitive from justice? Do you consume marijuana or other kind of depressants unlawfully?

Q. Okay. And based off the answers to these yes or no questions, what does your gun store do?

A. Well, generally the first question is should and always should be yes if you are the actual buyer of the firearm.

Q. Okay.
A. And then every other question should be no, right. Now in some cases, people do mark yes or some of these questions. And if they do, that's when we would actually turn them away.
Q. Okay. So let's just focus on 21A.
If a person with was to mark no, that they are not the buyer of the firearm, what would you do?
A. We actually would stop the sale right there. Because the person is saying that they are not the purchaser of this firearm. Like they're almost buying it for somebody else essentially.
Q. So do the answers to these questions help you to determine if you can sell a firearm to a person or not?
A. Yes, ma'am.
Q. All right. So we're going to go to Page 2 of this exhibit and we're going to continue looking at this form. Okay. So we have this top portion right here. If you can let the jury know what this section is.
Is this just a continuation of the question?
A. This is a continuation of the questions from the first page.
Q. Okay. And I just have a question because there's so many questions, do you sometimes help the customers with this application?
A. If they need help interpreting the question, yes.

Q. Okay. And when you say "interpreting the question", approximate what do you mean?
A. If they're not understanding what the question is asking.
Q. Okay. So after the questions, the yes or no, what section is that?
A. After the yes or no, they would be signing below that and dating, certifying that everything they've answered on these questions is true.
Q. Okay. Thank you. So we're going to move on to next portion of the form. I believe that starts at number twenty -- I can't see that.
A. 24?
Q. 24 perhaps?
A. Section C?
Q. Yep, let's talk about Section C.
Who completes this portion of the form?
A. That would be the sales staff or the person selling the firearm.
Q. Okay. And what do they have to put in here?
A. We would be selecting the type of firearm that it is. That's in Section 24. 26 is their driver's license or state ID information. And then below that, 27A is the date which the background check was ran. And then 27B is the actual background number.
Q. Okay. Let's pull up 27B just so we can see that. Oh, I'm

sorry.

That's the -- you said you would put the background check number in there?

A. Um-hum.

Q. All right. Let's look at the rest of the form.

So is there any other portions that are to be filled out by the gun store?

A. Yeah. So right below 27 is 27C there. So once we've processed the application through the background check system, it would provide us with one of three answers. The first answer being a proceed, which is basically giving us the green light to sell the person the firearm.

If the person were to get denied, that means we are not able to sell them the firearm. We would give them a piece of paper for them to get in contact with the ATF to figure out why their background check is getting denied.

The most common one is the box that says delayed. Quite a few people get delayed on firearms, which is basically they are on a 7-day hold to be able to purchase that firearm.

Q. Okay. And what else -- what's the next section?

A. 27D. So if the customer were to say -- if the customer were to get delayed, within that 7-day time period they could either come through as a proceed or a deny. So within that 7 days, we'll either get an answer that they are able to purchase or that they are not able to purchase.

Q. Okay. So this section primarily deals with background information?
A. Yes, ma'am.
Q. Okay. So we're now going to turn to Page 3 of this application. Okay.
What is this section at the top of Page 3?
A. So 29 where it says issuing state and permit type, that would be if the customer has the CPL license, the Concealed Pistol License.
Q. Yep.
A. We would enter that information in on that section.
Q. Okay.
A. And then Section 30, like I stated, if the customer were to get delayed and they were to come back to pick up the firearm after those amount of days, they would be recertifying Section 30 and dating Section 31.
Q. Okay. And what about Section E?
A. Section E -- 32 would actually be just where we would put in the customer's phone number. 33 would have our stamp for our store showing our name, address, and FFL license.
Q. Okay. All right. So we're now looking at the remaining questions.
Is that also to be completed by the store?
A. Yeah. So 34 would be the sales staff that was selling the firearm. 35 would be their signature. And 36 would be the

date that the firearm was transferred.
Q. Does that generally sum up the end of the application?
A. There is more information on the paper. But for the most part, that is the majority that we have people read and fill out.
Q. Okay. So can you generally explain to me what else is left on the application?
A. It's more like instructions on how to fill the form out. For example, there's parts where if somebody doesn't have a middle name, they would write the letters NMN on the middle name box. So it's just more instructions about the form.
Q. Okay. So generally do you go over that section with customers?
A. No, ma'am.
Q. Okay. So primarily, the application consists of three pages that need to be filled out?
A. Correct.
Q. And the majority is filled out by the gun store; is that correct?
A. Yes. A small portion is done by the customer and then the rest of it is filled out by us.
Q. Okay. And I know we talked about the layout of the store, but where would someone complete this form?
A. At the table that we have in the side of the building. Or I'm sorry, in the back side of the show floor.

Q. When someone is sitting at that table and they're filling out this form, are they -- do they have to sit by themselves if they're with other people?
A. Sometimes people sit by themselves. Sometimes they don't.
Q. So it's not banned that a person could -- a friend could sit with a person while they're filling out their application?
A. No, that's not an issue.
Q. Okay. Okay. So you said something about background checks.
At what point do you run the background check?
A. Once this form has been filled tout and completed by the customer, that's when we would confirm that all of the information that they filled out on here matches to their ID. Address is one of them. So we have to make sure that the address that matches their ID is what they put on the form.
Also making sure that they answered the questions correctly. And then if the form is filled out correctly, that's when we would submit the background check.
Q. When you say answer the questions correctly, are you talking about those yes/no questions?
A. Yes, ma'am.
Q. And so you rely on those yes/no questions and answers?
A. To be able to sell a firearm, yes.
Q. Okay. And so back to the background check, you mentioned earlier that the FBI is the ones that run the background check;

is that true?
A. Um-hum.
Q. Okay. And I want to talk about -- we talked about if multiple people come, that they can sit at the table while a person is filling out that form?
A. Um-hum.
Q. Can multiple people come to the store together to shop --
A. Yeah, of course.
Q. -- for guns?
When multiple people come in and say, perhaps, they sit at the table, do you run a background check on the people that's with the person that's filling out the form?
A. No, ma'am.
Q. So why is that?
A. They're not the ones purchasing. So unless they're coming up to purchase, that's the only time we would take their ID or have them fill out this form.
Q. Okay. So only the purchaser has a background check completed on them?
A. Correct.
Q. Okay. So it's common for people to bring friends or family while purchasing firearms?
A. Yes, ma'am.
MS. MOORE: Your Honor, may I approach at sidebar?
THE COURT: Certainly. All right. So we'll put on

our white noise and have a conversation at the sidebar.

MR. CRAWFORD: Your Honor, I wanted to bring to the Court's attention that it looks like juror I think number 4 or in position 4 is falling asleep.

THE COURT: Oh, I was going to talk to you about sleeping. Whenever you see a juror fall asleep, if you'll just try to signal to me -- I'm just constantly scanning -- and I'll just ask that we all take a stretch break or I'll drop something right next to the microphone and that will wake them up.

MR. CRAWFORD: Okay.

THE COURT: Thank you for taking that initiative.

(Open Court)

THE COURT: Okay. We're all set. Go ahead, Ms. Moore.

MS. MOORE: Thank you.

BY MS. MOORE:

Q. So I think I was asking is it common for friends and family to come inside the store together?

A. Yes, ma'am.

Q. Okay. After the background check is completed, what happens?

A. After the background check is completed and we get the green light to sell the firearm, we would put the customer's information in our point of sale system and then start the

process of cashing them out.
Q. Okay. And what do you do with the form after this is completed?
A. So for every firearm sale, we have a file for that customer and that transaction which contains the form that they filled out, their ID copy, and also the registration sales record.
Q. Okay. And are these forms stored somewhere?
A. Yes, ma'am.
Q. Where are they stored?
A. They're stored in the office in filing cabinets alphabetically by year.
Q. How long do you keep the forms?
A. Forever.
Q. Okay. So we talked about this 4473 form.
Are there any other forms that are completed to purchase a firearm at your store?
A. If the customer is purchasing a handgun, there's something called a pistol sales record that is required by the state for us to fill out.
There's three sections on that form. One section is for the customer to keep. One section is for the store to keep. And then the third section is for the police department.
Q. Okay.
MS. MOORE: Just one second.

Your Honor, may the witness turn to Exhibit 41?

THE COURT: Sure.

MS. MOORE: And I just want to state for the record I did advise defense counsel which exhibit.

THE COURT: You'd be using with this witness?

MS. MOORE: Yes, yes.

THE COURT: Oh, terrific. Thank you.

BY MS. MOORE:

Q. Okay. Mr. Bahri, are you at Exhibit 41?

A. Yes, ma'am.

Q. Okay. Do you recognize it?

A. Yes.

Q. What is it?

A. So this is the pistol sales record, also called an RI-060 form. This is the form that we would fill out if the customer is purchasing a handgun.

Like I stated, there's three sections. All the information would be the same on all three sections. The section to the right would be for the customer to keep. And then there's two on the left. One of them is for us to keep. And the top one is the one the customer has to turn in to their local police department.

Q. Okay. We'll break this counsel a little bit more.

But does the thing that you're looking at fairly and accurately depict what would have been used back in December of

2022?
A. Yes.
MS. MOORE: Okay. At this time, Your Honor, I'm moving to admit Exhibit 41.
MR. GEROMETTA: No objection.
THE COURT: Okay. Then it's received.
(Government's Exhibit No. 41 Admitted Into Evidence)
MS. MOORE: Permission to publish to the jury?
THE COURT: Yes.
BY MS. MOORE:
Q. All right. So Mr. Bahri, you kind of explained this in detail.
But can you explain to the jury why there are three copies of the same form?
A. The State of Michigan requires you to register any pistol that you purchase. So that's why we have to fill this out. So again, there's three sections which all would have the same information on them. And the section on the right, where it says purchaser copy, that would be the customer's copy. And then the two on the left, one would be ours and one would be the one that has to go to the local police department.
Q. Okay. So when you're at the store, can you walk me through what you would give the customer and what would you keep?
A. We would cut down the dotted line. We would give the

customer the right side of the form, and then we would give them the top left side of the form.
Q. Okay. And that is for them to turn in to a police station?
A. Yes, ma'am.
Q. And the form, the quadrant that you keep, what do you do with that?
A. We keep that in the file.
Q. OKAY. Are you saying with the 4473 form?
A. Yes, ma'am. It would be stapled to the customer's ID paper.
Q. Okay. And at what point of the sales process is this form that we're looking at introduced?
A. This would be at the end of the sale. This is basically the last thing that the customer would sign before we actually cash them out for the firearm.
Q. And what's the significance of like completing this form?
A. It's mandated by the state.
Q. Okay. Does it signify a transfer of the weapon?
A. Correct. It shows that we have transferred this specific firearm with this specific serial number to this customer.
Q. In practice, do you or your employees do anything when they're presenting this form to customers?
A. We would highlight the three sections where it says purchaser signature. And then we would also highlight the

licensing authority copy. We would highlight that part right there. That way the customer knows that's the one that they need to turn in.

Q. Okay. All right. So I want to talk about something called a multiple sales report.

Are you familiar with that?

A. Yes, ma'am.

Q. Can you tell the jury what a multiple sales report is?

A. A multiple sales record is if say a customer were to buy two handguns in the same day or by two handguns within a five-day period, we would have to fill out what's called a multiple sales record. One of them we would fax to the ATF. The other one we would mail to the local police department.

THE COURT: Oh, I'm sorry. Okay. Go ahead. That was an accident.

BY MS. MOORE:

Q. So who completes this multiple sales record?

A. Generally the office manager.

Q. Okay. And how does an office manager know when to complete this?

A. The computer auto generates the multi sales record for us. Because like I said, we have to enter in the customer's personal information in the point of sale. So if they were to come back and buy a firearm three days later, the computer would generate that form and tell us that there is a multi

form.

Q. Okay. So if a person buys a firearm on Monday and then comes back on Friday and purchases another firearm, would a record be generated?

A. Yeah, yeah. It would be generated because it's still within a five-day window.

Q. Okay. What about if a person buys two guns on a Monday and then another two on Friday, what would happen?

A. If they would have bought two on Monday, then one multi sales record would have already been generated. And then on Friday, it would actually auto generate the two from Monday and then the two from Friday. So then it would show four firearms on the form.

Q. Okay. Last background check -- I'm sorry, background question.

Do you all sell guns that are purchased from online?

A. So a person is able to purchase a firearm online and then it would have to get sent to an FFL dealer, you know, gun store for example. The customer would come in, fill out the same form that we first showed and then we would run their background check. And if they get approved, they would walk out with that firearm the same day.

So again, that's an online sale and we're just kind of of the middleman on that doing the paperwork for that, the background check.

Q. And what do you call this process?
A. We call it a transfer.
Q. Okay. Is there a fee associated with a transfer?
A. Yes, ma'am. It's an $85 fee.
Q. Okay. And as a part of that process, you said you still do the background check?
A. Of course.
Q. And a 4473 form?
A. Absolutely.
Q. And would you do the pistol sales record as well?
A. If there was a pistol that they purchased, yes.
Q. Okay. Is there a reason why a person has to come to your gun store rather than just having it shipped to their home?
A. Because the online reseller will not ship the firearm to a person's home. It has to go to a federally -- an FFL.
Q. Okay. All right. Does your store have video camera on the inside and outside?
A. Yes, ma'am.
Q. What system do you all use?
A. I believe it's a system called Hikvision.
Q. Okay. And who has access to this system?
A. It's mainly me as the manager.
Q. All right. And how long does this system keep footage?
A. For 35 days.
Q. Okay. And then what happens after 35 days?

A. It would -- I believe it would erase that footage and then keep recording for the next 35 days.
Q. Okay. Do you get requests from law enforcement to pull the footage from those cameras?
A. Yes, ma'am.
Q. How often does that happen?
A. Sometimes once a month.
Q. Okay.
A. Sometimes, you know, maybe three or four months and then they'll come in.
Q. Okay. And then what does that look like? What does that process if law enforcement requests footage?
A. Basically showing them the surveillance system. Sometimes they ask me to help them with the timeframe of downloading that section of video. So there's usually a start time and an end time. And then it would download that footage to a flash drive, USB flash drive.
Q. Okay. In your experience, does this system sometimes have the wrong time?
A. Sometimes, yeah.
Q. And what do you mean by wrong time?
A. It could be off by a couple of minutes.
Q. Okay. But is it ever off by more than a couple of minutes?
A. No, ma'am. It wouldn't be off by like a day or anything

like that. It could be off maybe by five minutes.
Q. Okay. And at your store you said that you sell firearms and they're in the middle island?
A. Yes, ma'am.
Q. What is the cheapest brand of firearm that you sell?
A. The cheapest brand of firearm would be the Taurus brand.
Q. Okay.

MS. MOORE: No further questions of this witness, Your Honor.

THE COURT: Okay. Well, maybe this is a good time to take a break. And then what we'll do is have cross-examination. And then if there are additional questions, it will be redirect, recross, and pretty soon we'll be done with this witness.

So what I'll do is remind all of our jurors not to talk to one another about the case. Talk to each other about the eclipse or anything else you wish to talk about. And we'll be back in here in about 10, 15 minutes altogether.

So please rise for the jury. And you can head into the jury room.

(Jury Out)

THE COURT: Please be seated. We do have a very sleepy number 4 juror. Thank you, Mr. Crawford, for bringing that to my attention. His glasses make it difficult for me to tell if his eyes are open or closing. He seems to have a long

period of closure between every blink now that I've got my eyes trained on him.

So we'll just do our best. But I just ask that everybody pause for a minute if you happen to see it. But I want you to focus on your case. I'll take as much responsibility for that as I can. But if I'm also focused, anybody else can sort of nod at me or let me know.

Anything for the Court while we're in this break? No? Okay. All right.

So you can step down. If you see a juror, don't speak to them, don't even say hello. And there are restrooms on the first floor.

THE WITNESS: Thank you.

(Brief Recess)

THE COURT: I might recommend a stretch break. That will be my next approach if we have a -- if our juror is still sleepy.

THE CLERK: All rise.

THE COURT: It takes a little while to get the order. Okay. Please be seated.

And to our witness, Mr. Bahri, you're still under oath to tell the truth from when I swore you in earlier. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: Good. Okay.

So now we're at the cross-examination phase. Go ahead, Mr. Gerometta.

MR. GEROMETTA: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GEROMETTA:

Q. Good morning, Mr. Bahri.

A. Yes, sir. Good morning.

Q. I don't have too many questions for you. I want to follow up, first, with -- I want to make sure I got your testimony right from what the government asked you.

Did you say on that 4473 -- do I have the right number for that ATF --

A. The form?

Q. Yes.

A. Yes, sir.

Q. On that 4473, you said there's a second form if they're purchasing more than three firearms?

A. Yes, sir.

Q. And that you said it goes from 4 through you said 15 or 20?

A. I believe so.

Q. Okay. And I'm not going to hold you to that exact number. But it's not 4 through 6, it's 4 through double digits?

A. Yes, sir. Yeah. So that's for that same purchase that day.

Q. That day, right.
A. Yes, sir.
Q. So you can come in the same day and buy 15 or 20 firearms?
A. Correct.
Q. Have you ever used that form, that second page of the form?
A. Not very often.
Q. Not very often. But you have?
A. Yes, sir.
Q. Okay. And then Ms. Fawaz, could you pull up Government's Exhibit 40 for me, please? I'm sorry. I should have warned you.
BY MR. GEROMETTA:
Q. So you went over this form. I'm not going to go over all the detail.
But this first part of it is basically for the buyer to fill out, correct?
A. Yeah. From Section B, 9 on down, yes, sir.
Q. Okay. And we say -- we say buyer and the government kept saying buyer.
But it's transferee or buyer?
A. Correct.
MR. GEROMETTA: Could you go to Page 2 of that, please.
BY MR. GEROMETTA:

And then on Page 2, Line 22, that's the buyer's or the transferee's signature, correct?
A. Correct. Yes, sir.
Q. And then after that, the rest of Page 2 and if we go to Page 3, that's all really for you or whoever's selling the firearm to fill out, correct?
A. Correct.
Q. All right. Selling or transferring the firearm, correct?
A. Correct. There's only one section for the customer. That would be Section 30 and 31.
Q. Okay. Right. And 30 and 31 are for if they filled out the first part on a different day then they're actually picking up the gun?
A. Yeah. So if their background check was delayed and they had to come back to pick up that firearm, they would be recertifying that all of the information that they filled out on that form is true.
Q. Okay. They didn't become a marijuana addict between the four days or whatever it was?
A. Yes, sir.
Q. Okay. That makes sense.

And then you said after that, it says Page 3 to 6.

So there's three and a half more pages after that, correct?
A. Correct.

Q. You said that's the part you, I think you said, don't go over with people, correct?
A. Correct.
Q. Could you turn to Page 4, please.
And you said it's instructions?
A. Yes, sir.
Q. And definitions, correct?
A. Yes, sir.
Q. And turn to Page 5. And turn to Page 6. Thank you.
So that ATF form is like a lot of other forms you see, you know, whenever you're signing a contract or doing something there's just -- there's a lot of sort of boilerplate language on the back of it, correct?
A. Um-hum, yes, sir.
Q. Thank you.
Could we turn to Government's Exhibit 41, please.
And that's -- this is the pistol sales record, correct?
A. Correct, yes, sir.
Q. Now when you -- when someone's buying a pistol from you, you -- do you just have blank copies of these? How does it work?
A. We have it generated on the computer.
Q. Okay.
A. So we've downloaded this file from the State of Michigan's

website. And we would fill in the -- we would type in all of this information that is not handwritten.
Q. Okay. So you type that information in?
A. Yes, sir.
Q. So if we look at the, sort of the top part of it, there is -- it says purchaser's name?
A. Um-hum.
Q. Date of birth. And then FFL number.
What's FFL number?
A. So the FFL number is the federal firearms license number that each gun store is issued by the Federal Government.
Q. So that's not your FFL number up there, is it?
A. No, sir.
Q. That's if the purchaser has an FFL, correct?
A. Correct.
Q. And if we go below that there's CPL number, correct?
A. Correct.
Q. And that's a CPL number if applicable, correct?
A. Yep.
Q. So if they have a CPL, ou fill that in, correct?
A. We would type the numbers that are on their card in that section.
Q. And then it doesn't say FFL number if applicable but it should, right? Because most people who buy guns from you don't have an FFL number, correct?

A. I would say almost every sale is not to an FFL. It is to a person.
Q. Because that basically would be selling to another gun store, correct?
A. Yes, sir.
Q. Or someone who's maybe a super collector?
A. Yeah. Like if we might have a particular firearm that a gentleman in another state might want, then we would be able to transfer the firearm from our FFL to that FFL.
Q. Okay.
A. But it is not something that we do.
Q. Not usually. Unusual.
A. Yes, sir.
Q. And then it says MCOLES number.
Do you know what that?
A. That's usually for police officers.
Q. Okay. Makes sense.
And then at the bottom, it says seller information, correct?
A. Um-hum.
Q. And that's where you put your FFL number in?
A. Yep. So where it says seller name, that would be the business name. And then below that would be the business license number. And then to the right of that is the background check number.

Q. The background check number.
A. Yeah.
Q. And that's when you run the background check on someone, it generates a number for you to put in there?
A. It generates an NICS transaction number.
Q. And you do that NICS background check on everyone?
A. Every firearm sell.
Q. And you can do that because you have access to this FBI background system, correct? The background check system you use is run by the FBI, correct?
A. Yes.
Q. And because you're an FFL, you have access to that?
A. Correct.
Q. And let me ask you some questions about your business generally.
How long have you been at Action Impact? I'm sorry.
A. I've been at this location for 9 years now.
Q. And you sell you said 5 to 10 guns a day you think?
A. Something like that, yeah.
Q. And other than guns, you said you sell tasers?
A. We sell accessories, ammunition. We also offer the course to customers.
Q. You said accessories.
What's a firearm accessory?
A. For example, like a holster. Maybe a flashlight or a

laser. We sell safes as well. So we consider all those accessories.
Q. So a flashlight or a laser, is that a flashlight or a laser that might attach to a firearm?
A. Correct.
Q. And what about like say a grip, to change out the grip on your firearm?
A. Yes, sir.
Q. Or a stock, a different stock for a firearm?
A. Stock, yeah. Magazine, bigger magazine.
Q. And do you sell those for all different kinds of firearms?
A. Correct.
Q. Do you sell AR-15 firearms?
A. Yes, sir.
Q. And when I say AR-15 firearms, that's -- are there a lot of sort of -- I don't want to can call them knockoffs -- but derivatives or copies of AR-15s out there by different companies?
A. There are a ton of different brands, yes, sir.
Q. So I'm going to use AR-15 generally. When someone says AR-15 in the gun business, you kind of know what they're talking about?
A. They'd be referring to a semiautomatic rifle.
Q. And they might be talking about a -- not necessarily -- AR is the Armalite company that makes that, right?

A. That was the can company that first started making them, yes, sir.
Q. So when they say AR-15, it might not be an Armalite, it might be --
A. It could be several different manufacturers. But it's the style of firearm which is an AR.
Q. And that style of firearm, is it very popular?
A. Yes, sir.
Q. Is it one of your top sellers?
A. I would say we sell more handguns than we do rifles, but it is a popular selling style of firearm.
Q. And there are a lot of accessories made for that firearm?
A. Yes, sir.
Q. Could you count the number of accessories made for it or is it close to infinite?
A. I mean, there's a lot of different types of accessories, different type of stocks, different type of grips. Different type of what we call a hand guard. So there are several, several different types of accessories for this firearm.
Q. And when people buy an AR-15 from you, do they sometimes come back in to buy those accessories afterwards?
A. Yes, sir.
Q. And do they, I mean, I guess for lack of a better word, sometimes trick out their AR-15 with different accessories?
A. Yes, sir.

Q. It's sort of a hobby in the gun world?
A. Yes, sir.
Q. To accessorize your AR-15?
A. Absolutely.
Q. And do people money multiple AR-15s?
A. Do they own multiple?
Q. Multiple AR-15s.
A. I'm sure people do, yes, sir.
Q. And people accessorize -- might accessorize their different AR-15s differently, correct?
A. Yes, sir.
Q. And you probably know -- I mean, you have regular customers I assume?
A. Yes, sir.
Q. All right. And regulars at the shooting range?
A. Yes, sir.
Q. And you probably know some of them that have multiple AR-15s that are tricked out or accessorized differently, don't you?
A. Yes, sir.
Q. Let's talk about some other guns you sell.
The Taurus you said was the cheapest gun you sell or among the cheapest?
A. Yes, sir.
Q. Do you sell a lot of them though?

A. We sell a fair amount of them, yes, sir.
Q. What about Glocks?
A. Glocks we sell a decent amount of those as well.
Q. That's a regular popular gun, right?
A. The brand is a really popular brand, yes.
Q. And there are, I don't know, 12 different models of Glocks?
A. There's more than that. But yeah, there's a lot.
Q. And they're different calibers?
A. Yes, sir.
Q. And they're different frame sizes?
A. Different frame size, different magazine capacity size different barrel lengths.
Q. And when we say frame size for the jury, what are we talking about?
A. We'd be talking about the frame, which is a part that your hand would grip. Some are longer, some are shorter, some are slimmer.
Q. And do they sort of have generally -- so when we talk about cars, right --
A. Yes, sir.
Q. -- we talk about compacts and subcompacts and luxuries and full size.
Do they have that kind of nomenclature in guns, too?
A. You could say so.

Q. So there's compact firearms, subcompact?
A. Subcompact, full size, um-hum.
Q. And Glock has a firearm in every conceivable range, doesn't it?
A. Correct.
Q. And would you call Glocks a mid priced firearm?
A. I would say they're mid priced, yeah.
Q. But they're still very popular?
A. Yes, sir.
Q. And they have a reputation for durability?
A. Yes, sir.
Q. And they're dependable?
A. Yes, sir.
Q. Okay. I have trouble with that word. Thank you.
What's your most popular firearm that sold do you think.
A. I would say the Glock brand is definitely probably the most popular.
Q. Okay. Thank you.
MR. GEROMETTA: Could I have a moment?
THE COURT: Yes.
BY MR. GEROMETTA:
Q. So you accept payment by Cash App?
A. No, sir.
Q. You don't. Credit card?

A. We accept credit, debit, or cash.
Q. Okay. And if someone has two transactions on the same day, say one for $380 and one for $40, does that reflect two separate purchases or one purchase? Would you split up a purchase like that, or would it be one purchase?
A. Sometimes if people ask if they can pay with two separate credit cards or if they can pay with cash and a card, that's not an issue.
Q. So it could be split up for purchase?
A. Yes, sir.
Q. Okay. Or it could be two separate purchases?
A. When you say purchases, what do you --
Q. Two separate items?
A. Yeah.
Q. And if someone hadn't paid for the entire -- let's say someone asks you to split up a purchase of a firearm?
A. Yes, sir.
Q. Would you let them leave with the firearm before they paid the second part of that purchase?
A. Of course not.
Q. Okay. All right.
MR. GEROMETTA: No more questions. Thank you.
THE COURT: Okay. Any follow-up, Ms. Moore?
MS. MOORE: Yes, Your Honor. Briefly.
THE COURT: Okay. Certainly.

REDIRECT EXAMINATION

BY MS. MOORE:

Q. Mr. Bahri, can you please explain to the jury what the difference is between an AR pistol and an AR rifle?

A. So an AR rifle has a 16-inch barrel. It has an adjustable stock that you would put up against your shoulder to be able to fire it.

A pistol would have a barrel length less than 16 inches. They're generally 7 to maybe 10 inches in barrel length. And then there isn't a stock for you to push up against your shoulder. There's just what we call a buffer tube at the end of it.

Q. Okay.

A. So a rifle is something that you would shoulder fire. And then a pistol -- AR pistol would be something that you would just kind of hold like so and then you wouldn't -- you would not be shouldering that.

Q. Okay. And when you just testified about guns that you could trick out, were you describing an AR pistol or an AR rifle?

A. He said AR rifle. They are kind of the same style of firearm, but they are different firearms.

Q. Can you elaborate for the jury, please?

A. The difference in them is, like I said, the barrel length. In order for it to be a pistol, it has to have a barrel length

under 16 inches and it cannot have a shouldering stock on it.

Q. Okay. Is there a difference in the price point for those two different types of guns?

A. Yes and no. I mean, we have some rifles and some pistols that are at the same price, yes.

Q. Okay.

MS. MOORE: If Ms. Fawaz could display Exhibit 41 for us. Okay. And then can we zoom into one of the quadrants. Okay.

BY MS. MOORE:

Q. I know you just testified about this, but I just wanted to zoom in.

So generally can you describe the three sections that this is broken into?

A. So the first section would be the customer's information, okay. And then below that would be the firearm, the pistol information, the serial number, the make, the model, the caliber, how many rounds the magazine would hold, the barrel length, and then the overall length of the firearm.

The last portion with would be the FFL's portion. It would have the store's name, address, licensing number, the background check number, and also the date that the firearm was purchased.

Q. Okay. And this section that we're zoomed in on, it says purchaser copy at the bottom; is that true?

A. Yes, ma'am.
Q. OKAY. And so the other quadrants would have different labels; is that true?
A. Yes. But all the information is the same on all three.
Q. And when you say it's the same, the top has a purchaser, bottom has the seller?
A. Correct.
Q. Okay.
MS. MOORE: Can we zoom into another quadrant, please.
BY MS. MOORE:
Q. Okay. All right. And the bottom of this one says licensing authority copy; is that true?
A. Yes, ma'am.
Q. Okay. All right.
MS. MOORE: And then can we zoom into the final quadrant.
BY MS. MOORE:
Q. Okay. And the bottom of this copy says seller copy; is that true?
A. Yes, ma'am.
Q. Okay. So just so reiterate what we talked about, this process of filling out this form as the last part of the sell at your store.
A. Yes, ma'am.

Q. Who would be the purchaser or would that be the customer?
A. That would be the customer's information.
Q. Okay. So when you're filling out this form, Action Impact is always filling out the bottom portion that says seller information; is that true? If it's a handgun?
A. Yes, ma'am.
Q. Okay.
MS. MOORE: No further questions for this witness. Thank you.
THE COURT: Mr. Gerometta.
MR. GEROMETTA: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. GEROMETTA:
Q. So let's talk about that AR-15 rifle and pistol difference.
A. Um-hum.
Q. You said they're similar. It's because they both use the AR-15 receiver, correct?
A. Correct.
Q. And the receiver is --
MR. GEROMETTA: Your Honor, could I approach the exhibits here?
THE COURT: Yes.
MR. GEROMETTA: Can I pick one up? I just want to be able to demonstrate.

THE COURT: Certainly. And we -- again, they've been disabled so that they can be safely handled.

BY MR. GEROMETTA:

Q. So this is not an AR-15, correct?

A. No.

THE COURT: Well, does it have an exhibit number just so that our record will reflect?

MR. GEROMETTA: Exhibit Number 4.

THE COURT: Okay.

BY MR. GEROMETTA:

Q. So it still has -- all firearms have a receiver, right?

A. Yes, sir.

Q. So the receiver is basically this part with a trigger here and the firing mechanism?

A. Yes, sir.

Q. And when you say the barrel, you're talking about -- you can barely see the barrel on this?

A. Yes, sir.

Q. But it probably runs back into the receiver?

A. Yes, sir.

Q. So the AR-15 rifle and pistol both use the same receiver, correct?

A. Yes, sir.

Q. And you said the difference is barrel length?

A. Barrel length. And then also the rifle has a stock on it,

which you would put up against your shoulder in order to fire, and the pistol would not have that.
Q. So barrels are removable, correct?
A. Yes, sir.
Q. Okay. So you could take your AR-15 pistol and you technically could put a longer barrel on it, correct?
A. As long as the barrel is under 16 inches, yes, sir.
Q. And that's because it's a law that your pistol can't have a barrel over 16 inches?
A. Correct.
Q. So if you were to put a different barrel on it, you'd be breaking the law, correct?
A. If the barrel is over 16 inches and it is registered as a pistol.
Q. That would be against the law?
A. Yes, sir.
Q. And you talked about how they have -- what do they have instead of a stock?
A. It has a buffer tube.
Q. A buffer tube.
MR. GEROMETTA: So I'm going to bring up the slide from the government's opening.
THE COURT: So this is one of the pages from the government's PowerPoint?
MR. GEROMETTA: It was -- I thought it was originally

in their opening, Your Honor. It wasn't. But they are going to use it as a demonstrative and don't object to me bringing it up.

THE COURT: Okay. So what Mr. Gerometta's talking about is we have two kinds of exhibits -- couple more than that. But one is the exhibits that I receive into evidence and that you'll be able to consider in the jury room.

The other is something called a demonstrative exhibit. And that's something that a lawyer or their assistant creates to help show you the evidence. But it's not evidence all on its own. But it's certainly fair game to talk about. So go ahead.

MR. GEROMETTA: Thank you.

BY MR. GEROMETTA:

Q. So you see where it says October 24 and there is two Anderson Manufacturing AM-15s?

A. Yes, sir.

Q. Those are both AR-15s derivatives, correct?

A. That is an AR pistol.

Q. Okay. It's an AR pistol?

A. Yes, sir.

Q. So how do you know it's a pistol?

A. It's a pistol because of the barrel length and that it doesn't have a stock to shoulder fire.

Q. So that's that buffer tube that's on it, correct?

A. That is correct. That is a buffer tube.
Q. And the same thing on the 26th, the two --
A. At the bottom, yes, sir.
Q. Yep. Those are pistols with buffer tubes correct?
A. Um-hum.
Q. And those are supposed to be fired one handed?
A. They could -- yes, they're supposed to be fired one handed. They could be held with two hands as well.
Q. Okay. And that buffer tube is removable, correct?
A. The buffer tube is removable. But if it is removed, the firearm will not operate.
Q. Okay. What could you replace it with? Can you replace the buffer tube with something?
A. A different buffer tube.
Q. A different buffer tube?
A. Um-hum.
Q. Okay. Could you put folding stock on an AR pistol? You can't do it legally, but is it possible to do so?
A. Yes, sir.
Q. And it will still operate?
A. Yes, sir.
MR. GEROMETTA: Can we do a sidebar, Your Honor?
THE COURT: Sure.
(Sidebar Conference)
MR. GEROMETTA: So Your Honor, I'm going to use

Defense Exhibit A as a demonstrative exhibit. There are of these the guns I think 10 or 11 of them are AR-15 derivatives. Some are pistols and some are rifles. But they're all accessorized differently. I want to show it to the witness to talk about how he can accessorize an AR-15.

THE COURT: And is that relevant to our case? I just don't know.

MR. GEROMETTA: It is, Your Honor.

THE COURT: And if it is, just tell me how.

MR. GEROMETTA: Because their theory is that you would only buy multiple firearms, multiple ARs to resell them or you're likely to resell them. Our defense is that they also can be purchased because you're going to accessorize them all differently.

So I think to demonstrate how they can be accessorized is an important part of the defense.

MR. CRAWFORD: Your Honor, he's speculating. I mean, that's -- he doesn't know our theory. None of that has come up in our testimony --

THE COURT: Well, this is his defense and he doesn't have to tell you all of his defense. So let me make sure -- let me just see if I can articulate.

Something -- an exhibit has to be relevant to a claim or a defense. So it's not relevant to the government's claims. But your defense is that your client purchased

multiple firearms so that he could trick them out differently?

MR. GEROMETTA: Correct, Your Honor. And Your Honor --

THE COURT: Will there be --

MR. GEROMETTA: It is one of the government's claims. They have an expert who's going to testify that multiple sales purchases of the same gun are an indicia of firearms trafficking. If he's not going to testify that way, that's fine. But I mean, that was what was presented.

THE COURT: Okay. I don't see the harm in it. If this is his defense, which is that he's going to be able to raise or show a lack of evidence beyond a reasonable doubt that firearms trafficking was or selling without a license was going on because his client -- he'll have to have evidence that the client purchased the tricking out feature.

Do you have --

MR. GEROMETTA: Do I have that evidence?

THE COURT: Yes.

MR. GEROMETTA: No, I don't.

THE COURT: Just one at a time.

MS. MOORE: Sorry.

MR. GEROMETTA: But I think that if the government wants to make that argument, that we haven't presented that evidence, in their closing I, think that's fine. But I think even if he hadn't tricked them out, if he purchased for the

intent of doing so as opposed to resell.
THE COURT: Just one person. Who's --
MR. CRAWFORD: I don't know that we can make that argument that way. I think the burden shifting to say that they didn't present that evidence. It would be our burden to sustain that he was or was not.
THE COURT: Was or was not what?
MR. CRAWFORD: Tricking out these or -- I'm sorry, selling. Engaged in the business of selling.
THE COURT: Right.
MR. CRAWFORD: We're veering into this idea of tricking out firearms. There's no evidence suggesting that. None of these -- I mean, I need to discuss with our expert. But to my knowledge, none of these are in the style -- sorry. In the style of any of the weapons that were purchased.
THE COURT: Okay. Just limit your -- did he purchase the AR-15 rifle or whatever the word is --
MS. MOORE: No.
THE COURT: -- that gets tricked out? Or did he purchase ones, pistols, that don't get tricked out?
MR. GEROMETTA: I think he testified pistols also get tricked out.
THE COURT: Oh, did he testify --
MR. CRAWFORD: No, I don't think that was the testimony.

MR. GEROMETTA: I can go ask him right now.
THE COURT: Okay. Ask him if pistols get tricked out. If pistols get tricked out, you can discuss tricking out.
MR. GEROMETTA: Okay.
THE COURT: Okay.
(Open Court)
THE COURT: Okay. Thank you for your patience to the jury. Okay.
Mr. Gerometta, go ahead.
MR. GEROMETTA: Thank you.
BY MR. GEROMETTA:
Q. I'm sorry. I just want to clarify something.
So we talked about how the rifles, AR-15 rifles get tricked out. AR-15 pistols also get tricked out, correct?
A. Yes, sir.
Q. Okay. Thank you.
MR. GEROMETTA: If I can approach, Your Honor?
THE COURT: Yes.
BY MR. GEROMETTA:
Q. So I'm handing you what's been be marked as Defendant's Exhibit A.
So on Exhibit A, you see a number of firearms, correct?
A. Yes, sir.

Q. Are some of those AR-15s?
A. Yes, sir.
Q. A fair number, correct?
A. Yes, sir.
Q. And are -- some of them appear to be of pistol length, correct?
A. Yes, sir.
Q. Okay.
MR. GEROMETTA: Your Honor, with that, I'd move to publish the exhibit.
THE COURT: Any objection?
MS. MOORE: No, Your Honor. Sorry.
THE COURT: Okay. Then Defense Exhibit A is received.
(Defense Exhibit No. A Admitted Into Evidence)
MR. GEROMETTA: Sorry, Your Honor. My computer went to sleep.
THE COURT: That's okay. This is the part where real life is not like television.
BY MR. GEROMETTA:
Q. So of those firearms there, how many of them appear to be -- and I know you don't have them to examine. But just from their appearance here, how many of them appear to be AR-15s or AR-15 derivatives?
A. I would say at least 10 of them are.

Q. Okay. And if we look at the gun that's sort of the one in the middle at the seam a little low, it looks considerably shorter than the rest of them, correct?
A. Yes, sir.
Q. And you would -- obviously you don't have a tape measurer, you don't have it. But you would have to guess that barrel is probably less than 16 inches, correct?
A. Yes, sir.
Q. And it appears to have a shoulder stock on it, correct?
A. Correct.
Q. So that would not be under ATF regulations a lawful gun, correct?
A. Well, that is not a pistol. That would be considered a short barrelled rifle.
Q. Okay. It would be a short barrelled rifle. Which you'd need a special permit to have, correct?
A. Correct. Yes, sir.
Q. And you can't tell whether that receiver was actually intended to be a rifle or a pistol, correct?
A. Correct. Yes, sir.
Q. Because they're identical?
A. The receiver itself?
Q. Yes.
A. Yes.
Q. Okay. And then the same thing with the one second from

the bottom on the far right, correct?
A. Yes, sir.
Q. It's same issue. Could be a rifle. Could be a pistol. But it was turned into a short barrelled rifle, correct?
A. Correct.
Q. And so at least 10 of those are really the same gun just with different doodads on it, correct?
A. Yes, sir.
Q. Okay. And the AR-15 is designed with a series of rails on it that allow you to make it easy to do that, correct?
A. Yes, sir.
Q. Okay.

MR. GEROMETTA: No more questions. Thank you, Your Honor.

Your Honor, did the Court admit this? I don't remember if --

THE COURT: Yes, I did receive it. But can you -- it's a photograph I think with 17 different guns on it. And did you use it in your opening PowerPoint or --

MR. GEROMETTA: It was in our opening, yes.

THE COURT: Okay. So that's how we'll identify what it is.

MR. GEROMETTA: Okay. Thank you. Thank you. Appreciate it.

THE COURT: Ms. Moore.

MS. MOORE: Thank you, Judge. I know you discussed boards back in the day.

THE COURT: Yeah. Go right ahead if you have a board you want to use.

MS. MOORE: While they're setting up, I can go ahead and ask you a question.

THE COURT: The issue with boards is often that you want the witness to be able to see them and the jury. So we've got to find a place -- and I need to be able to see the defense lawyers in case they have an objection. There we go. That should work.

MS. MOORE: Thank you, thank you.

THE COURT: Although now -- we'll see.

MS. MOORE: Can Mr. Bahri, if he needs to, step out of the witness box to look at the demonstrative?

THE COURT: Sure, sure. This is it. This is bringing back memories of carrying these.

MS. MOORE: Wow.

THE COURT: Now I can't see Ms. Swanson. But Mr. Gerometta is handling this witness.

MR. GEROMETTA: Yes.

Is that okay?

MR. GEROMETTA: That's okay. And we're familiar with these, so we're good.

THE COURT: Okay. Good.

MS. MOORE: Thank you.

REDIRECT EXAMINATION

BY MS. MOORE:

Q. So I want to still direct your attention to Defense Exhibit A.

So you testified that these -- can you generally explain what these weapons depict?

A. Some of them depict AR style rifle. Some of them depict a short barrelled rifle. It looks like there's also a bolt action rifle on there. Or maybe two bolt action rifles.

Q. Okay. So there's primarily rifles in this photo?

A. Correct. Not all of them are AR style rifles.

Q. Okay. So can you elaborate what that means?

A. Like for example, the one on the top left, that is considered a rifle, but it's not considered an AR style rifle.

Q. Okay. And I'd like for you to come out, if need be, and look at the demonstratives that are in court that are displayed.

Can you take a second to begin by looking at the guns displayed in 2020. And then look at the guns displayed in 2021. And then look at the guns displayed for 2022 and 2023. Okay.

Are you familiar with the guns that are displayed?

A. Yes, ma'am.

Q. Okay. And they also have the names of the make and model

of those guns? Are you familiar with those makes and models?
A. Yes, ma'am.
Q. Okay. And of these guns, are any of them considered to be rifles?
A. I would say this June 10 is a rifle.
THE COURT: June 10 of what year?
THE WITNESS: 2021.
THE COURT: Okay.
BY MS. MOORE:
Q. Okay. Any of the other guns considered to be rifles? Or AR pistols?
A. Yeah. So October 24, 2020, those are AR pistols. May 7 of '21, those are AR pistols. (Court reporter clarification.) May 7 of 2021, that is an AR pistol. May 18 and May 22, there are five AR pistols total. And then June 13 of '21, there are four AR pistols.
Q. Okay. All right. And in reviewing Defense Exhibit A, compared to the firearms that are listed, are they similar or are they different?
A. So the one from June 10 of '21 is similar to the top left, the third one down.
Q. Okay. And what about any other firearms that you see listed. Of these 39 firearms, are any of them similar to the ones in the picture?
A. The style, yes, but not the exact same.

Q. Okay.

MS. MOORE: No further questions. Thank you.

THE COURT: Mr. Gerometta.

MR. GEROMETTA: One question.

THE COURT: This is like ping-pong. It just goes back and forth until we're done. Because really the ping-pong ball doesn't get involved in this game of ping-pong.

RECROSS-EXAMINATION

BY MR. GEROMETTA:

Q. So that exhibit went away. But could the firearms, the AR style firearms that were purchased here be made to look like the firearms in that photo?

A. Yes, sir.

Q. Thank you.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. MOORE:

Q. Can could they legally be made to look like the photos that were in Defense Exhibit A?

A. Yes.

Q. So you're saying that they would be -- if they were modified to look like Defense Exhibit A, those would still be legal firearms?

A. So the only thing that's questioning is these ones that he showed here, like I mentioned, those are short barrelled

rifles. Those could have been pistols at one point and then converted to that via approval by the ATF.
Q. Okay. But if there's no approval, then that's an illegal short barrelled rifle?
A. That is correct, yes, ma'am.
MS. MOORE: Okay. No further questions.
THE COURT: Mr. Gerometta.

RECROSS-EXAMINATION

BY MR. GEROMETTA:
Q. So if you didn't -- if these were modified, there's ways to modify these -- they don't look exactly like the ones in the photograph -- but they would still be legal, correct?
A. Yes, sir.
Q. There's many ways to modify them without ATF approval, correct?
A. If it stays as a pistol, yes.
Q. Thank you.
A. And by modify would be adding an attachment. For example, an optical sight, maybe a flashlight. But adding a stock to a pistol would turn it into a short barrelled rifle. Yes, sir.
Q. But you could add different magazines, change the grips, optical sights, all those sorts of things?
A. Those are accessories, yes, sir.
Q. Thank you.
THE COURT: Okay. Any further questions for this

witness?

MS. MOORE: No, Your Honor.

THE COURT: All right. Good. Well, thank you, Mr. Bahri, for being here and you're free to step down and leave. If you want to stay in the courtroom and watch the trial, you're welcome to.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay. Does the government have another witness you wish to call?

MS. MOORE: Yes, Your Honor. The government calls Special Agent Steve Allick.

THE COURT: Agent Allick, will you raise your right hand.

Do you solemnly swear or affirm to tell the truth, the whole truth, and nothing but the truth?

Thereupon,

**S T E V E N A L L I C K ,**

having been called as a witness and having been first duly sworn testified as follows:

THE COURT: Good. Thank you.

Now do these need to be up here, these demonstrative?

MS. MOORE: No.

THE COURT: Can you just take them down so that I can see everybody. Thank you.

DIRECT EXAMINATION

BY MS. MOORE:
Q. Agent Allick, can you please introduce yourself to the jury and spell your last name.
A. Steven Allick, A-l-l-i-c-k. I'm a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.
Q. Okay. And how long have you been there?
A. Just under 10 years.
Q. And are you assigned to a special group?
A. Yes, I am.
Q. What is that group called?
A. Currently it's the NIBIN enforcement group.
Q. And when you say NIBIN enforcement group, what do you mean by that?
A. NIBIN stands for the national ballistic information network. And essentially when shell casings are recovered or firearms are recovered, they're linked up to different scenes.
Q. When you say linked up to different scenes, scenes of what?
A. Could be shootings, could be firearm recoveries, anything along those lines. When shell casings are recovered they're entered into NIBIN. When firearms are recovered, they're test fired and they enter those shell casings in for a comparison.
Q. Okay. So do you have any special roles and responsibilities with your assignment to that group?
A. I'm just a case agent in that group.

Q. Okay. As a case agent, how many times have you served in this role over the past two years?
A. Dozens.
Q. Okay. And what is a case agent?
A. Case agent is just one of the lead investigators on the case.
Q. Do you have any prior education related to law enforcement?
A. No. I just have a bachelor's degree in criminal justice from Wayne State.
Q. Okay. So what kind of cases have you worked in your 10 years of experience at the ATF?
A. Various cases involving the illegal use, possession, purchase, sell of firearms.
Q. Okay. Are you familiar with the investigation of Omar Shorter, Jr.?
A. Yes, I am.
Q. How did you become involved with the investigation of Mr. Shorter?
A. In December of 2022, we were viewing multiple sales reports and we were alerted of some of Mr. Shorter's purchases.
Q. Okay. So you said multiple sales reports?
A. That's correct.
Q. Can you please explain for the jury what a multiple sales report is?

A. Multiple sales report is generated any time an individual purchases two or more handguns within a five business day period.
Q. Okay. And who is responsible for submitting this report?
A. The FFL where the firearms were purchased.
Q. Okay. And where do they submit it to?
A. To the ATF.
Q. Okay. And what does the ATF do with the forms?
A. They're then published and agents and law enforcement officers are able to review them.
Q. Okay. So you have access to review multiple sales reports?
A. Yes.
Q. Okay. Are multiple sales reports created if a person goes to one gun store and then a different gun store in that five-day period?
A. Only if they purchase two or more handguns from the same firearms dealer.
Q. Okay. So in a situation where a person bought one gun from store A and one gun from store B, would a multiple sales report be created?
A. No.
Q. Okay. Is buying multiple guns illegal?
A. No.
Q. Okay. So why does the ATF use the report in its

investigations?
A. Multiple sales reports are leads, investigative leads for people who may be trafficking firearms.
Q. Okay. Did you review multiple sales reports associated with the defendant in this case?
A. Yes, I did.
Q. How many of them did you review?
A. Approximately six.
Q. Okay. So let's talk about what this report consists of.
What does the report state?
A. The report states the individual who purchased the firearms, what firearms they purchased, where they purchased them from, and when they purchased them from -- or when they purchased the firearms.
Q. Okay. Would it also include the quantity of the firearms purchased?
A. Yes, it will.
Q. Okay. So the who, when, what, and where?
A. Yes.
Q. Okay. So I'm going to show you what's been marked as government's --
MS. MOORE: I'm sorry, Your Honor. -- can I approach a sidebar? I'm sorry.
THE COURT: Sure.
(Sidebar Conference)

MS. MOORE: I'm sorry. We have a stipulation as to these exhibits because there's a lot of forms.

THE COURT: Okay.

MS. MOORE: I just didn't put it on the record.

MR. GEROMETTA: Yeah.

THE COURT: Just say I'm going to show you exhibit 30. Do you have any objection, Mr. Gerometta. He'll say no and I'll say it's received.

MS. MOORE: Okay.

THE COURT: And then you can go through all the identification.

MS. MOORE: Thank you.

(Open Court)

THE COURT: Okay. Go ahead.

BY MS. MOORE:

Q. Agent Allick, I'm going to show you what's been previously marked as Government's Proposed Exhibit 42A.

Do you have it?

A. I've got to open the binder.

THE COURT: And for members of the jury, what the lawyers just told me at the sidebar is that they've already discussed many of the exhibits.

So do you want to move for the admission of 42A?

MS. MOORE: Yes. Judge, at this time, the government moves for the admission of 42A, 42B, 42C, 42D, 42E, and 42F.

THE COURT: Oh, I see. Okay. E and F.

MS. MOORE: So 42A through F.

THE COURT: Okay. Any objection?

MR. GEROMETTA: No objection.

THE COURT: Okay. So those are all received. And then that helps it just move along a little faster.

(Government's Exhibit Nos. 42A, 42B, 42C, 42D, 42E, and 42F Admitted Into Evidence)

MS. MOORE: Thank you.

THE COURT: So we've got 42B, C, D, E, and F.

MS. MOORE: Yes.

THE COURT: Go ahead.

BY MS. MOORE:

Q. So I'm showing you what's been admitted as 42A.

What is it?

A. That's a multiple sale summary report.

Q. Okay.

MS. MOORE: May I publish, Your Honor?

THE COURT: Yes.

MS. MOORE: Okay. We're going to zoom in towards the top of this form.

BY MS. MOORE:

Q. Okay. All right. Can you walk me through what's on this form.

A. Yep. Starting in the top left, it has the dealer

information. So that's the federal firearms licensee, which in this case is Fast Lane Outdoor Supply.
Q. Okay.
A. If you move to the right, it has the purchaser information. It has the purchaser date of 10-24 of 2020. Has the name of the purchaser, Omar Shorter, Jr. And then if you go down a little bit, it has the weapon summary, it has the weapon count, which you can see is 2. And the firearms purchase, which are two Anderson Manufacturing Model AM-15 pistols.
Q. Okay. And when is this report entered?
A. This has an entered date of December 9 of 2020.
Q. Okay. And is there a reason why the entry date is after the firearms is -- a couple of months after the firearms are purchased?
A. I'm unsure the exact reason. But the FFLs are to submit multiple sales summaries the same business day.
Q. Okay. And then the ATF will produce the form that we're looking at?
A. Correct.
Q. Okay. All right. I'm going to show you -- so just generally, what does this form show?
A. That on 10-24-2020, Mr. Omar Shorter, Jr. purchased two pistols.
Q. Okay. All right. Now I'm going to show you what's been

previously admitted as Exhibit 42B. We're going to zoom in. Okay. So we've already went over the elements of this form.

Can you tell me what this form generally says here?

A. Same thing of the dealer information, Fast Lane Outdoor Supply. Purchase date of 5-7-2021. The purchaser is Mr. Omar Shorter, Jr. Two firearms -- two pistols were purchased on that date. Karri's Guns 5.56 caliber.

Q. Okay. All right. And so we're now going to move on to government's previously admitted Exhibit 42C. Okay.

Can you please describe what this form states?

A. This form states, just like the previous two, it's a multiple sales summary. The dealer information is Fast Lane Outdoor Supply. A purchase date of 5-18 of 2021. Mr. Omar Shorter, Jr. was the purchaser. Three firearms were purchased on that date. Or three firearms are documented on this multiple sales summary.

Q. Okay. So when are the firearms actually purchased?

A. So if you see at the bottom, there's notes.

Q. Just one second. Okay.

A. So if you see the notes that A02170 added, that's the firearm that's on the third line, I believe.

Q. Okay.

A. So the first two firearms based on this report, it says change date of transfer from 5-15-2021 to 5-18-2021. So it appears based on this form that on 5-18-2021, that Kahr Arms

Auto-Ordnance was purchased.
Q. Okay. So what you're saying the first two firearms generated a multiple sales; is that correct?
A. That's correct.
Q. But this form was later edited to add a third weapon?
A. That's correct.
Q. Is that because it was still within that five-day period?
A. That's correct.
Q. All right. So we're going to move on. I'm going to show you what's been previously admitted as Government's Exhibit 42D. Okay.
Can you please describe this form for me?
A. Yep. This form, the dealer information is Target Sports. Purchase date of 5-23-2021. The purchaser is Mr. Omar Shorter, Jr. There is four firearms that are documented in this multiple sales report.
Q. Okay. And are there also notes at the bottom of this report?
A. Yes, there is.
Q. Okay. And what do the notes indicate?
A. That two additional firearms were added on to this multiple sales report.
Q. And why is that?
A. Because it was within the 5-day period.
Q. Okay. So more guns were purchased with within the 5-day

period?
A. That's correct.
Q. Okay. All right. So I'm going to now show you what's been previously admitted as Government's Exhibit 42E.
Can you explain for the jury what is on this form?
A. This is another multiple sales summary. The dealer information is Fast Lane Outdoor Supply. The purchase date is June 13 of 2021. The purchaser is Mr. Omar Shorter, Jr. Four firearms were purchased on that date.
Q. Okay. In your training and experience, is there anything significant about this form?
A. The multiple sales report?
Q. Yes.
A. Like I previously mentioned it, it helps identify individuals that may be involved in trafficking of firearms.
Q. Okay. And so now I'm going to turn to government's previously admitted 42F. Okay. And can you describe for the jury what this last multiple sales summary says?
A. Yes. This is -- the business is Action Impact. Purchase date of 12-9-2022. The purchaser is Mr. Omar Shorter, Jr. Two firearms were purchased.
Q. Okay. And so you said you reviewed all six of these multiple sales summaries?
A. Yes, I have.
Q. Okay. Did you review -- and just to make it clear for the

jury, what was the significance of those six multiple sales summaries in totality?
A. Just the amount of firearms that were purchased.
Q. Okay. All right. Did you review any other documentation in your initial investigation of Mr. Shorter?
A. Yes. We reviewed trace reports.
Q. Okay. Can you explain for the jury what a trace report is?
A. Yes. A trace report is generated when law enforcement recovers a firearm. So once the firearm's recovered, law enforcement fills out a trace report, which is submitted to the ATF to help identify who the original purchaser is.
Q. Okay. And so once law enforcement fills this out, what does the trace report consist of?
A. The trace report will consist of the original purchaser. When the firearm was recovered, whom the firearm was recovered from, if there's an individual listed. And the time to crime as well as the firearm information.
Q. Okay. We'll break this down. Who keeps tracks of these forms?
A. The ATF.
Q. And so you said that the form contains the original purchaser.
Where does that information come from?
A. The tracing center does like essentially an in-depth

investigation. And it comes from the federal firearms licensee, wherever the firearm was purchased from.

Q. Okay. And a federal firearms licensee, is that a gun store?

A. Yes.

Q. A licensed gun store?

A. Yes.

Q. Okay. And what is the purpose of using this form in your investigation?

A. Similar to the multiple sales, to potentially identify an individual that may be trafficking firearms.

Q. Okay. And can you explain for the jury what the term "time to crime" means?

A. Yeah. So time to crime is the amount of time that elapsed from when the firearm is initially purchased to when it is recovered by law enforcement.

Q. Okay. What happens if the police recover a gun that has been abandoned?

A. So a firearm is found in an open field or anything like that, there will be no possessor listed.

Q. So you can still have a trace report, it just wouldn't have a person as a possessor?

A. Correct.

Q. Okay. All right. And so how -- did you review any traces associated with the defendant?

A. Yes, I did.
Q. Approximately how many traces did you review?
A. Approximately 10.
Q. So does that mean 10 recoveries of guns associated with Mr. Shorter?
A. Yes.
Q. Okay. Why is this important?
A. It's a significant amount of firearms that Mr. Shorter purchased that were later recovered by law enforcement.
Q. Okay.
MS. MOORE: Just a second, Your Honor.
THE COURT: Sure. Take your time.
MS. MOORE: Your Honor, I had an opportunity to discuss the exhibits that the government intends to introduce through this witness, and I believe Mr. Gerometta has no objection.
MR. GEROMETTA: That is correct, Your Honor.
THE COURT: Okay. Good. Okay. And what numbers are they?
MS. MOORE: So 4C, 6C --
THE COURT: 4?
MS. MOORE: Yeah. 4C.
THE COURT: So back at the beginning. Okay.
MS. MOORE: 6C, 7 --
THE COURT: 6C, okay.

MS. MOORE: 7C.

THE COURT: Okay.

MS. MOORE: 8C.

THE COURT: Thank you.

MS. MOORE: 10C.

THE COURT: I see a theme.

MS. MOORE: 32C.

THE COURT: Okay.

MS. MOORE: And 34C.

THE COURT: Got it. So there's no objection to those exhibits. So for the jury, they're received as evidence in our case.

(Government's Exhibit Nos. 4C, 6C, 7C, 8C, 10C, 32C, 34C Admitted Into Evidence)

BY MS. MOORE:

Q. Agent Allick, I'm showing you what has been previously admitted as Government's Exhibit 4C. Can you please explain for the jury -- we can start off with the top right section. Okay.

What does this part of the form explain?

A. Shows a -- it has a request date. Typically when the trace was requested, a completion date, and then the firearm information of the recovered firearm.

Q. Okay. All right. And then we're going to zoom out. Okay. And then can we go to the purchaser -- I'm sorry, the

purchaser information. Okay.
And what does this state?
A. This shows that on 10-20-2020, Mr. Omar Shorter, Jr. was the purchaser of the firearm that was recovered.
Q. All right. If with we can zoom out again. Okay. So let's now talk about the recovery information.
Can you please explain the recovery information for the jury?
A. Yep. The recovery information, it shows the recovery date of 2-17 of 2021. The time to crime of 120 days, which I mentioned is the amount of time that has passed by from when the firearm was purchased to when it was recovered by law enforcement. On the left side, it has the recover information, the location, and the possessor.
Q. Okay. And who is the possessor of this firearm?
A. Trayvon Andre Nichols. [Phonetic]
Q. Okay. All right. So we're going to move on. I'm going to show you government's previously admitted Exhibit 6C. Okay. All right. Let's start off at the top with the firearm information.
Can you please explain what type of firearm this is for the jury?
A. This says it's an Anderson Manufacturing. The model's an AM-15 5.56 caliber pistol.
Q. Okay. All right. And if we could go to the purchaser

information.

Agent Allick, who's the purchaser of this firearm?

A. Mr. Omar Shorter, Jr. with a purchase date of 10-24-2020.

Q. Okay. And now let's go to the recovery information. Okay.

A. It shows the recovery date of 8-4 of 2022. Time to crime of 649 days. And the recovery location of 9534 Littlefield Street in Detroit, Michigan.

Q. Okay. Why does this not have a possessor?

A. Kind of like I mentioned earlier, it could be recovered in a field or abandoned property.

Q. Okay. All right. I'm now going to show you government's previously admitted Exhibit 7C. Okay.

Starting, again, with the firearm information, can you tell the jury what type of gun this is?

A. This is a Glock Model 32 caliber .357.

Q. It's a pistol?

A. It's a pistol, yes.

Q. Okay. And now we're going to look at the purchaser information.

Who's the purchaser of this gun?

A. Mr. Omar Shorter, Jr. Purchase date of 10-26-2020.

Q. Okay. And then let's go to the recovery section. Okay.

A. Firearm recovery date of 11-22-2021. A time to crime of 392 days. Location was Fenkell and Trinity Street in Detroit.

The possessor was Deshawnte Deon Sutton. [Phonetic]

Q. All right. We're going to go to the next form. But going forward, we're just going to zoom in on the recovery information and you can just tell us what type of gun and who purchased it.

Okay?

A. Okay.

Q. So we're now turning to I believe 8C. Okay.

Can you tell me what type of gun and who purchased it originally?

A. Yep. It was a Glock Model 19, 9 milliliter pistol. Originally purchased on 10-26 of 2020 by Omar, Jr.

Q. Okay. And let's now talk about the recovery information.

Can you please explain where, who, and when the gun was recovered?

A. Recovery date of 11-9 of 2022. Time to crime was 744 days. Harlow and Vassar Street in Detroit. Possessor was Charles Noel. [Phonetic]

Q. Okay. Turning now to government's previously admitted Exhibit 10C. Okay.

Can you please tell me what type of gun was recovered?

A. An American Tactical import. The model was a Omni Hybrid 5.56 caliber pistol. The purchaser was Mr. Omar Shorter, Jr. on 10-26 of 2020.

Q. Okay. Turning to the recovery information.
A. The recovery date was 3-18 of 2022. Time to crime was 508 days. The recovery location was 33043 Hamilton Court Apartment 102 in Farmington Hills. A possessor of Devonte Hadley. [Phonetic]
Q. Now we're going to turn to Government's Exhibit 32C. Okay.
Can you tell us about the gun and the original purchaser?
A. Yep. The firearm information is a Glock Model 43, 9 millimeter pistol. The original purchaser Mr. Omar Shorter, Jr. Purchase date of 7-7-2021. The recovery information, recovery date was 9-14-2021. Time to crime was 69 days. The location was Plainview and Orangelawn Street. The possessor was Marquan Bennett. [Phonetic]
Q. And we're now going to turn to our final trace, which is Government's Exhibit 34C. Okay.
Can you please tell me about the gun and the original purchaser?
A. Yep. The firearm information, the -- it was a Glock Model 23, .40 caliber pistol. The firearm was originally purchased on 8 -1 of 2021 by Mr. Omar Shorter, Jr. The recovery information has a recovery date of 1-10 of 2022. Time to crime of 162 days. Recovery at St. Cyril and Huber in Detroit, Michigan. Possessor was Dejuan Jackson. [Phonetic]

Q. Okay. Okay. So we just talked about -- so we just talked about seven traces linked to seven recoveries of guns that the defendant purchased.
Is that true?
A. That's correct.
Q. Okay. What's the significance of this to your investigation?
A. Like I mentioned earlier, it's an investigative lead on somebody with who may be trafficking in firearms.
Q. Okay. During your investigation, did you meet Mr. Shorter in person?
A. Yes, I did.
Q. Okay. And when did you meet him?
A. During the execution of a search warrant.
Q. Okay. Did you have an opportunity to speak with him?
A. Yes, I did.
Q. Okay. Over the course of your investigation, did you review records which contained his identification?
A. Yes, I did.
Q. Is Mr. Shorter present in the court today?
A. Yes, he is.
Q. Where is he seated and what is he wearing?
A. He's at defense counsel table wearing a black polo.
MS. MOORE: May the record reflect that the witness has identified the defendant?

THE COURT: Yes.
BY MS. MOORE:
Q. After you found -- I'm sorry. I want to go back just one question.
So in addition to reviewing these traces, do you do anything else in furtherance of your investigation after reviewing the traces?
A. Yes. If it's a recent trace and/or multiple sale, we'll follow up with the federal firearms licensee where the firearms were purchased.
Q. Okay. Do you -- without getting into the circumstances, do you see how the gun was recovered?
A. Can you elaborate on that?
Q. Without saying why a gun was recovered, did you do any investigation as to the recoveries of the guns outside of the traces?
A. We had reviewed the accompanying police report.
Q. Okay. All right. And back again to the surveillance thing that you mentioned.
Can you please tell me what, if anything, you did as far as investigation in looking for surveillance?
A. For this investigation, we went to Action Impact. And we reviewed and obtained surveillance footage related to the December 5 and December 9 purchase.
Q. Okay. And were you able to get that footage from Action

Impact?
A. Yes, we were.
Q. Were you alone or with a partner when you went to Action Impact to pull the footage?
A. I was with my partner, Special Agent Tim Madison.
Q. Okay. And who did you speak to?
A. I believe we spoke with one of the managers there.
Q. Okay. And what happened next?
A. They allowed us to review the surveillance footage from their DVR.
THE COURT: Ms. Moore, let's all take a stretch break, because I'm hoping we can keep going to noon. Are all the jurors okay without another break? Great.
Let's stand up and take a deep breath. I know I can use it. And it's kind of warm in here, too, which makes it conducive to being warm. Okay. Let's be seated and we'll keep going.
Thank you, Ms. Moore.
MS. MOORE: Thank you, Judge.
BY MS. MOORE:
Q. Agent Allick, did you attempt to find surveillance from other purchases by Mr. Shorter?
A. Yes, we did.
Q. Okay. And were you able to find any additional surveillance?

A. No, we were not.
Q. So only the surveillance at Action Impact on the 5th and 9th of 2022?
A. Correct. Correct, yes.
Q. Thank you. In your training and experience, have you previously pulled video surveillance from stores?
A. Yes, I have.
Q. Okay. Do you have training on how to do so?
A. No. It's just on-the-job training we learn.
Q. Okay. And can you walk me through the process of what you would do when pulling footage?
A. Yeah. Typically the first thing when reviewing footage, the store manager, owner, whomever it is, gives us access to the footage. And then the first thing we do is we compute the current time to the time that's listed on the video surveillance footage. That way we're able to tell right in the beginning if there's any discrepancies in the footage times.
Q. Okay. And why is this important?
A. Just so we're accurate with the footage that we're reviewing.
Q. Okay. And so in this case, were you and your partner able to do that from the footage from December 5 and 9 of 2022?
A. Yes, we were.
Q. And what, if anything, did you find while you did that process?

A. So at Action Impact there's two different recording systems. One for the outside and one for the inside. The inside cameras were approximately two minutes and 25 seconds slow, and the outside cameras were approximately 1 minute and 42 seconds slow.
Q. Okay. Can you please elaborate for the jury what that means?
A. So the recording camera time is slow. It's behind the realtime. So they're not perfectly synced up. So that way we're able to essentially calibrate it when we're reviewing the footage.
Q. Okay. And did you calibrate it here?
A. In this investigation?
Q. Yes.
A. Yes.
Q. And did you do anything to verify that your calibration was correct?
A. Like I said, we used an app in the beginning to confirm the time was accurate. And then later on, we confirmed it by viewing the timestamp on a receipt from Action Impact.
Q. Okay. So let's go back. So you said you used an app.
What is that app called?
A. I believe it's just DVR calculator. It's a website.
Q. Okay. And then you said you reviewed a receipt. How did you use the receipt to verify the time?

A. When we were reviewing the footage, we used the calculation. And there's a timestamp on the receipt as to when the transaction occurred. And it was --
Q. And you -- go ahead. I'm sorry.
A. And it was the 2 minutes and 25 second difference.
Q. So it matched up your calibration?
A. That's correct.
Q. Okay. How did you decide what dates and times you wanted to pull for the video?
A. Based on a review of the multiple sales report, they're labeled December 5 and December 9 for the transactions.
Q. Okay. And once you were finished checking the time, what did you do next?
A. We were able to essentially called clip the footage. So we were able to extract or download the portions of the video that were pertinent to this investigation.
Q. And what did you do with that footage then?
A. Downloaded it on to a flash drive and placed it into ATF evidence.
Q. Okay. Agent Allick, have you had an opportunity to review the surveillance and clip certain portions of the surveillance in Government's Proposed Exhibit 44?
A. Yes, I have.
Q. Do the recordings and the clippings from the recordings fairly and accurately represent the recordings you retrieved

from Action Impact in December of 2022?

A. Yes, they do.

MS. MOORE: Okay. At this time, Your Honor, the government would move to admit Exhibit 44, which we have pre clipped and provided to defense counsel.

THE COURT: Okay.

MS. MOORE: 44A and 44B.

THE COURT: Okay. Any objection?

MR. GEROMETTA: No, Your Honor.

THE COURT: Okay. Then those will be received as well.

MS. MOORE: Thank you.

(Government's Exhibit No. 44A and 44B Admitted Into Evidence)

BY MS. MOORE:

Q. Okay. In your review of those videos, did you see Mr. Shorter in the videos on December 5 and 9 of 2022?

A. Yes.

Q. How do you know that it's Mr. Shorter?

A. Through this investigation reviewing his Michigan driver's license as well as our interaction during execution of the search warrant.

Q. Okay. Did you also review records associated with that transaction?

A. Yes, I did.

Q. On December 5 and December 9?
A. Yes, I did.
Q. Okay. Generally, what do you see happening on both of those dates?
A. Mr. Shorter filling out the ATF Form 4473 and purchasing firearms.
Q. Okay. Turning specifically to December 5 of 2022, can you please -- I'm sorry -- publish 44A Clip 1? Okay.
Can you please tell me in your review of the surveillance what happened when Mr. Shorter arrived at the gun store?
A. Mr. Shorter arrived, entered the gun store, and interacted with somebody inside the business and filled out an ATF Form 4473.
Q. Okay. I'm going to play clip 1.
(Recording Played)
BY MS. MOORE:
Q. And just for the record, Your Honor, that has been clipped from the start of 1:36 ending in 2:35?
THE COURT: Okay. Thank you.
MS. MOORE: If you could please pause it, Ms. Fawaz.
BY MS. MOORE:
Q. Agent Allick, what time does Mr. Shorter arrive at the gun store?
A. On the timestamp, it's slightly before 16:28.

Q. Okay. And so is that military time?
A. Yes, it is. So a little bit before 4:28 PM.
Q. Okay. Thank you. All right.
MS. MOORE: And if you could press play, Ms. Fawaz.
(Recording Played)
BY MS. MOORE:
Q. Agent Allick, do you recognize Mr. Shorter exiting the vehicle in this video?
A. Yeah. After reviewing multiple surveillance footage, yes.
Q. Okay. All right. So I'm going to now play Government's Exhibit 42A2. Before we press play, I just have one question.
Did he enter -- which door did Mr. Shorter enter through at Action Impact?
A. The main entrance.
(Recording Played)
BY MS. MOORE:
Q. Can you please tell the jury -- I'm sorry. If we can pause it for a second. Okay.
Can you please tell the jury what you -- what we're watching?
A. So this is inside Action Impact. On the top middle of the screen is the double doors, the main entrance. Just previously to those two individuals walking out, Mr. Shorter walked in.
Q. Okay. This is paused at 16:28 for the time.
So Agent Allick, there's a table displayed in that.

Do you know where that -- what the table's significance is?
A. Typically where individuals fill out the 4473 for the purchase of a firearm.
Q. Okay. And do you know where the firearms would be stored in this clip?
A. In that center counter kind of on the top right portion of the screen.
Q. Okay. All right.
MS. MOORE: If we can press play on this clip.
(Recording Played)
BY MS. MOORE:
Q. Where is Mr. Shorter at now in this clip?
A. He just disappeared. But he's kind of the top right portion. There's a cash register over there.
Q. Okay. And we're going to go ahead and proceed on to the next clip, which is Government's Exhibit 44A3. Okay.
In your review of this clip where Mr. Shorter is completing the 4473 form, is there anything you noticed that is significant about that?
A. Not that I recall. Maybe if I review the video, it would refresh my memory.
Q. Yep. Let's play the video.
Do you see Mr. Shorter in this clip?
A. Yes. He's the individual in the black puffy coat interacting with the sales associate.

Q. Okay. And that sales associate, the area that they were at, is that where IDs are copied?
A. Based on my understanding, yes.
Q. Okay. Okay.
MS. MOORE: Can you pause. Okay. This is at the -- sorry. At the 16:33 time mark.
BY MS. MOORE:
Q. Is this Mr. Shorter filling out the 4473 form?
A. Yes, it is.
Q. Okay. Do you notice if he has anything in his hand?
A. It appears he has cash in his left hand.
Q. Okay.
A. Maybe a pen or pencil in the right hand.
Q. Okay. We can resume the video at this time.
(Recording Played)
BY MS. MOORE:
Q. Okay. Agent Allick, in your review of this video, does Mr. Shorter complete the 4473 form?
A. Yes.
Q. And hand it to the sales associate?
A. Yes.
Q. Okay. Did you later obtain that 4473 form Shorter filled out?
A. We obtained a copy of it.
Q. Okay.

MS. MOORE: Let the record reflect that I -- Your Honor, at this time, the government would like to publish 37B. There's no objection from Mr. Gerometta.

THE COURT: That's the case, Mr. Gerometta?

MR. GEROMETTA: Correct, Your Honor.

THE COURT: Good. Okay. Then 37B will be received as an exhibit.

(Government's Exhibit No. 37B Admitted Into Evidence)

BY MS. MOORE:

Q. Okay. I'm showing you what's been marked as Government's Exhibit 37B.

What is it?

A. This is ATF Form 4473, a firearms transaction record.

Q. Okay. And where did you get this from?

A. This is a copy from Action Impact.

Q. Okay. All right. We're going to zoom in to Section A of this form. Okay.

Can you please let the jury know what Section A states?

THE COURT: Can you block out the social security number? Let's take it down real quickly and we'll block that out. We just try to do our best with documents. Sometimes the number is part of the case. So if it's not part of the case here, we'll just have it blocked out. Thank you.

This is the time when I was a law clerk doing the job

that Brittany is doing with me, the judge I was a law clerk for would turn to the jury and tell jokes. But so I thought, well, maybe I should the tell -- I memorized those jokes, believe me. There were like three of them and he cycled through them.

But I'm not very good at telling jokes so we'll have to talk about something else. And we'll just wait for Ms. Fawaz to tell us she's ready.

I wonder if there's a way to just -- do you have any objection, Mr. Gerometta, to proceeding with the social security?

MR. GEROMETTA: I don't, Your Honor. I think the jurors are not taking -- not that I think --

THE COURT: I'll just ask the jurors please don't take down the social security number. We can go ahead. And I wasn't suspecting that you would. I just try to be consistent in all my cases. I never know who's in the courtroom and what's going on, so.

Oh, there you go. It's gone. Magic. All right. Let's keep going then.

MS. MOORE: Thank you, Judge.

BY MS. MOORE:

Q. All right. So Agent Allick, I'm turning your attention to Section A of this form. What does it state?

A. Section A states must be completed by the

transferor/seller before transferee/buyer completes Section B. And it has the manufacturer with the firearm information.

So this one, the manufacturer is a Taurus, the model is a G3c with a serial number. The type of firearm, which is a pistol. And the caliber, which is a 9 millimeter.

Q. I don't think we've talked about this, but is there any significance to the ATF in firearm serial numbers?

A. They're unique identifiers to specific firearms.

Q. And do they help you with the reports that you previously mentioned? So the multiple sales reports as well as the trace, do you use a serial number to keep track of those firearms?

A. Yes.

Q. Okay. So here, how many firearms are to be transferred?

A. One.

Q. Okay. And if we keep going down the form to Section B, what is this? Can you please explain to the jury what information is here?

A. This is information regarding the transferee/buyer. So it's their full name. Last name first and then their middle. Current address, place of birth, their height, weight, date of birth, sex. And then it talks about their race and ethnicity.

Q. Okay. So turning our attention to Section 21.

Can you please read the first question -- or I'm sorry the Question 21 for the jury.

A. Question 21 says answer the following questions by

checking or making either the -- excuse me.

Answer the following questions by checking or marking either the yes or no box to the right of the questions.

Q. Okay. And so for 21A, can you please read for the jury what it states.

A. Question 21A, are you the actual transferee/buyer of the firearm or firearms listed on this form and any continuation sheet -- sheets ATF form 5300.9A. Warning: You are not the actual transferee/buyer if you are acquiring the firearm or firearms on behalf of another person. If you are not the actual transferee/buyer the licensee cannot transfer the firearm or firearms to you.

Q. Okay. So what does Mr. Shorter answer to that question?

A. Yes.

Q. Yes. So we're now going to turn to Page 2 of this exhibit. Okay.

And what do you see at the top of this page?

A. It's just the series of questions that are continuing.

Q. Okay. And does Mr. Shorter fill out all of the questions that ask for a yes or no answer?

A. Yes, he does.

Q. Okay. And the only question that he marks yes is the question we've discussed on the previous page?

A. That's correct.

Q. And all the rest of the answers are no?

A. That's correct.
Q. Okay. All right. And so now turning to Question 22.
Is that Mr. Shorter's signature?
A. Yes, it appears so.
Q. Okay. All right.
MS. MOORE: If we can zoom out. I just want to -- okay.
BY MS. MOORE:
Q. And so the rest of this form, Section C, is to be completed by the gun store; is that correct?
A. That's correct.
Q. Okay. All right. And so we'll now turn to Page 3. Okay.
Do you see the name of the gun store on this page under 33?
A. Yes. Action Impact.
Q. Okay. And there is at the end on 34 where it says transferor/seller's name.
Were you able to verify if that was a sales associate at Action Impact?
A. Yes.
Q. Okay. And the number that is listed in 32, is that Mr. Shorter's phone number?
A. It was at the time, yes.
Q. Okay. All right let's keep going down. Okay. All right. And so let's go to Page 4. Okay.

Agent Allick, what are we looking at now?
A. This is a copy of a pistol sales record.
Q. Okay. And who is the purchaser listed as?
A. Omar Shorter, Jr.
Q. What is the pistol listed as?
A. Pistol is a Taurus Model G3c 9 millimeter pistol with the serial number.
Q. And what about the seller's information?
A. The seller information is Action Impact. It has their address, the date of transfer, as well as their FFL number.
Q. And is the transfer date December 5 of 2022?
A. Yes, it is.
Q. Okay. All right.
MS. MOORE: So if we can keep going down on this exhibit. Okay. Let's stop right here.
BY MS. MOORE:
Q. And what are we looking at now, Agent Allick?
A. The top photo is a copy of Mr. Shorter's Michigan Concealed Pistol License. And the bottom photo is Mr. Shorter's Michigan identification card.
Q. Okay. And in your review of the surveillance, were these items copied for Mr. Shorter during the purchase of the firearm?
A. Yes. It appeared so.
Q. Okay. All right let's keep going down. All right. And

so right here we have a receipt.
Can you please explain to the jury what the receipt denotes?
A. The receipt denotes one Taurus pistol Model G3c. The total was $85 paid in cash.
Q. Okay. And so the cashier, is that that same sales associate that signed the 4473 form?
A. Yes.
Q. Okay. And is there a time that the purchase is completed on this receipt?
A. It says 12-5-2022 at -- that's the date. The time is 4:40:37 seconds.
Q. Is this the receipt that you mentioned that you used to corroborate that the time was correct for the surveillance?
A. This one as well as the one from December 9.
Q. Okay. All right. And if we can just go down.
And just to confirm, so this, it does say cash, right?
A. Yes. Under the receipt on the right, it says total $85. Underneath it says cash.
Q. All right. Let's keep going. Okay. And we're now on Page 6 of this exhibit.
Mr. Allick, what are -- I'm sorry. Agent Allick, what are we looking at now?
A. This appears to be another federal firearms licensee, a

copy of their license.
Q. Okay. And why is that included in this exhibit?
A. This purchase was an online purchase. So the firearm was purchased online and transferred to Action Impact. And you can see on the top portion it was from GrabAGun.com.
Q. Okay. Does that explain why the gun only was $85?
A. Yes. That's typically the transfer fee.
Q. Okay. Thank you. All right.
So we're going to now turn back to our surveillance in this gun store.
What happened after Shorter completes this 4473 form?
A. The firearm was transferred to Mr. Shorter.
Q. Okay. And do you recall from your view of the surveillance how he paid?
A. I believe he paid with cash.
Q. Okay. So I'm now showing what's been previously admitted as Government's Exhibit 44A4.
(Recording Played)
MS. MOORE: Okay. Can we pause it for just one second. Okay.
BY MS. MOORE:
Q. Agent Allick, can you please explain for the jury what view we're looking at?
A. So the view we're looking at now to the far right side of the screen is the main entrance to the store. And kind of on

the top middle, top back right is the table where you saw Mr. Shorter filling out the 4473 earlier.
Q. But you can't see the table from this view?
A. That's correct.
Q. Okay. And where is Mr. Shorter located at?
A. Pretty much in the center of the screen. There's a mat on the floor that says Action Impact. That's where he's standing.
Q. Okay. And this register that they're at, typically what happens at this register?
A. Typically that's where the transactions occur.
Q. Okay. And when you say transactions, do you mean payment for a gun?
A. Yes.
Q. Okay. All right. If we can go ahead and hit play again.
(Recording Played)
BY MS. MOORE:
Q. Agent Allick, in reviewing this clip, what is happening now at this time?
A. This appears that Mr. Shorter is purchasing the firearms and the transaction is occurring.
Q. Okay. And this is at the 16:43:20 mark.
Is he completing a 4473 form at this counter or is he doing the pistol sales record?
A. The 4473 appears to already have been completed. This looks like the Michigan pistol sales record. You can see an

individual highlighting something on a piece of paper.
Q. Okay. And so is this towards the end of the transaction?
A. It is.
Q. Okay. And in your review of this surveillance, does Mr. Shorter then exit the store with a firearm?
A. Yes.
Q. Okay. All right. So I'm now going to play what's been admitted as Government's Exhibit 44A4.
THE COURT: Ms. Moore, you know, it's just a couple of minutes after noon.
Are you about to wrap up with this witness?
MS. MOORE: I'm not about to wrap up, but I'm about to wrap up with December 5.
THE COURT: Okay. Is everybody okay with just wrapping up a couple of more questions? Okay. Thank you.
BY MS. MOORE:
Q. I'm sorry. All right. So after he completes the transaction, do you recall approximately what time Mr. Shorter exits the store?
A. Based on this review, the timestamp is 16:50. So approximately 4:50 PM based on the timestamp. But there is a difference in the time.
Q. Okay. All right. Okay.
MS. MOORE: Nothing further.
THE COURT: So for members of the jury, we will wrap

up for today so that you can all enjoy the eclipse or just do whatever you wish to do with your afternoon. And I'll just remind you not to talk about the case with each other or anyone else. And should anyone approach you to talk, let me know. To talk about the case that is.

So with that, what we'll do is adjourn for the day and we'll be right back at it at 9:00 AM in the morning. And I've moved things around on my schedule so we can go until 4:30 tomorrow. And we'll get a lot of work done together.

So please rise for the jury.

(Jury Out)

THE COURT: Please be seated. And you're welcome to step down. Anything -- do you -- will you be filing or submitting to Bill the cases you want me to look at regarding the contested jury instructions?

MR. CRAWFORD: We can do either. Whatever the Court's pleasure or preference.

THE COURT: Why don't you start by submitting it to Bill because -- and to opposing counsel. And we'll just see what it is and then sort out whether you want to file a brief or what we're going to do.

Does that sound agreeable?

MR. CRAWFORD: Yes. Thank you.

MR. GEROMETTA: Yes, Your Honor.

THE COURT: Okay. All right. So I'll see you -- is

there anything for us to do together at 8:30 in the morning other than the jury instructions?

MR. CRAWFORD: I don't believe so, Your Honor.

THE COURT: Let me communicate with you this afternoon about whether we'll start at 8:30. I want to just see how complicated it is and what we're up against. And we may be able to just start at 9:00 and address the jury instructions on a break. But I'll wait until I've looked at the cases.

And do you have exhibit numbers for the weapons that are on the table? Because one of them was used, but I'm not sure we clearly have on the record what that exhibit number is.

MS. MOORE: Yes, Your Honor. I believe that we may have put the wrong exhibit number on the record.

THE COURT: Okay.

MS. MOORE: Just to clarify --

THE COURT: I was thinking that because -- okay. Go ahead.

MS. MOORE: So for the record to clarify, the weapon that was handled by Mr. Gerometta is Proposed Exhibit 39.

THE COURT: Okay. And it is the larger of the two?

MS. MOORE: Yes.

THE COURT: Okay. Good.

MS. MOORE: The second firearm that's on the table,

which has not been used, is Proposed Exhibit 3.

THE COURT: Okay. Good. All right. That's all I had. So I will see you all at nine o'clock unless you hear from me that we need to start at 8:30. And we'll be -- we'll just start right away. I think our juror now knows her way here and will be here on time.

Also, thank you for drawing to my attention -- I think we've had a couple of slightly drowsy jurors. We may try to turn the heat down in here to keep people on edge a little bit trying to stay warm. We'll do something.

MR. GEROMETTA: I'll object more.

THE COURT: There you go. Put on a show for them. Thank you.

(Proceedings Concluded)

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Jeseca C. Eddington, Federal Official Court Reporter, do hereby certify the foregoing 128 pages are a true and correct transcript of the above entitled proceedings.

/s/ JESECA C. EDDINGTON 01/22/2025
Jeseca C. Eddington, RDR, RMR, CRR, FCRR Date